[No. 40808-9-I.    Division One.    February 1, 1999.]

DONALD A. SILVES, ET AL., *Appellants*, v. SHERILYNE KING, M.D., ET AL., *Respondents*.

---

[13]*See Hennig v. Crosby Group, Inc.*, 116 Wn.2d 131, 134, 802 P.2d 790 (1991).

874

*Steven M. Robey*, for appellants.

*Thomas H. Fain, Christopher H. Anderson*, and *John E. Gagliardi* of *Fain Sheldon Anderson & Vanderhoef, P.L.L.C.*; *Margaret A. Sundberg, Kimberly D. Ellwein Baker*, and *Mary R. Knack* of *Williams, Kastner & Gibbs, P.L.L.C.*, for respondents.

ELLINGTON, J. — Donald A. Silves presented himself at the emergency room of St. Joseph Hospital complaining of a sore toe. Dr. Sherilyne King examined him and took a medical history, learning that Mr. Silves was taking heparin for a blood clotting problem. Dr. King diagnosed gouty arthritis and prescribed indomethacin. The hospital pharmacist filled the prescription and a discharge nurse handed Mr. Silves written discharge instructions that warned patients with blood clotting problems against taking indomethacin. Within two weeks of his visit to St. Joseph, Mr. Silves suffered a pulmonary hemorrhage. He filed a medical mal-

practice action against Dr. King for prescribing indomethacin, and against the hospital for the alleged negligence of the discharge nurse and the pharmacist for their failure to warn him of possible harmful drug interactions and to discuss the prescription with Dr. King. Summary judgment was entered in favor of the hospital on the claims involving the nurse and pharmacist, and the jury returned a verdict in favor of Dr. King.

The sole issue on appeal with regard to Dr. King relates to the admissibility of employment records containing Mr. Silves' medical history. We find that the records were not admissible under either the medical records exception or the business records exception to the hearsay rule, and accordingly affirm the judgment in favor of Dr. King.

With respect to Mr. Silves' claim against the hospital for the acts of its employees, we find that neither the nurse nor the pharmacist had a duty to warn Mr. Silves of potential drug interactions or to question Dr. King's prescription. We also find that the nurse did not have a duty to review the written discharge instructions with Mr. Silves after she had given them to him. Accordingly, we affirm the summary judgment entered in favor of the hospital.

## Facts

On September 8, 1992, Mr. Silves went to the emergency room at St. Joseph Hospital complaining of a sore and swollen toe. Because of his medical history, Mr. Silves was concerned that he might be experiencing another blood clot.

Sherilyne King, M.D., a board certified emergency room physician, examined Mr. Silves, took his medical history, and x-rayed his toe. Dr. King diagnosed gouty arthritis and prescribed indomethacin, a nonsteroidal anti-inflammatory drug. Dr. King directed Mr. Silves to follow up with his regular physician within five days.

At the time he went to St. Joseph's, Mr. Silves was tak-

ing heparin, an anticoagulant, for blood clotting problems. Dr. King knew this when she prescribed indomethacin. According to the Physicians' Desk Reference (PDR), indomethacin is indicated for the treatment of gouty arthritis. The PDR does not indicate that indomethacin should not be used by a patient who is taking heparin. It does, however, advise caution when prescribing indomethacin to a patient with coagulation defects. Dr. King testified this is why she directed Mr. Silves to see his regular physician within five days, rather than the 12 to 14 days she typically advises.

The discharge nurse on duty in the emergency room gave Mr. Silves two pages of discharge instructions. She highlighted the name of the medication that Dr. King had prescribed, indomethacin. Under the name of the drug, the instructions listed numerous warnings, including "Do not take [indomethacin] if you: . . . have . . . problems with bleeding or blood clotting." The nurse did not highlight these warnings.

Mr. Silves signed the discharge instructions under the statement: "I have received and can read the above instructions on 9/8/92 at 23:42[.] The risks and benefits of being discharged home have been explained to me and I agree with the plans outlined above."

After Mr. Silves received the discharge instructions, he waited in the car while his wife went to the hospital pharmacy to have the indomethacin prescription filled. He folded the discharge instructions, put them in the car's glove box, and did not read them before he took his first pill.

A licensed pharmacist on staff at St. Joseph filled Mr. Silves' prescription. The pharmacist did not recall filling Mr. Silves' prescription, but testified that had she known the patient was taking heparin, her standard practice would have been to call the prescribing doctor to make sure the doctor was aware of that fact before filling the prescription. Because there are no absolute contraindications to giving indomethacin to a patient taking heparin, the pharmacist

would have filled the prescription had Dr. King indicated she knew Mr. Silves was taking heparin and nevertheless wanted him to have the indomethacin.

Over the next several days following the September 8 prescription, Mr. Silves took both heparin and indomethacin. On September 23, 1992, Mr. Silves suffered a pulmonary hemorrhage. He was thereafter unable to return to work.

The Silves filed a medical malpractice action against Dr. King, St. Joseph Hospital, and Northwest Emergency Physicians (NEP), Dr. King's employer at the time. The trial court entered summary judgment in favor of NEP on the ground that it was neither vicariously liable for Dr. King's conduct nor independently liable. The trial court also entered summary judgment in favor of the hospital on the Silves' claims alleging negligence by the nurse and the pharmacist. The matter proceeded to trial with Dr. King as the only defendant. The jury found that Dr. King did not violate the standard of care, but that she did fail to obtain Mr. Silves' informed consent to indomethacin treatment. However, the jury found that the failure to obtain informed consent was not a proximate cause of Mr. Silves' injury. Judgment was entered in favor of Dr. King.

### Appeal of Summary Judgment in Favor of Hospital

■ ■ The trial court entered summary judgment in favor of St. Joseph Hospital on Mr. Silves' claim of negligence on the part of its employees, the discharge nurse and the pharmacist. Our review of the grant of a motion for summary judgment is de novo, and the facts are considered in the light most favorable to the nonmoving party. *Reynolds v. Farmers Ins. Co.*, 90 Wn. App. 880, 884, 960 P.2d 432 (1998). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file, and the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). The existence of a duty is a question of law. *Tincani v.*

*Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621 (1994).

## Pharmacist: Failure to warn the patient

Mr. Silves alleged that the hospital, through the conduct of its pharmacist, was negligent for failing to warn Mr. Silves or Dr. King of potential "drug interactions and contraindications" between heparin and indomethacin. We conclude that the pharmacist did not have a duty to warn Mr. Silves under the circumstances presented, and that summary judgment was properly granted.

■ A pharmacist's duty with respect to filling prescriptions was set forth in *McKee v. American Home Prods.*, 113 Wn.2d 701, 782 P.2d 1045 (1989). In that case, the defendant pharmacists had, over a period of some 10 years, filled the plaintiff's prescription for an appetite suppressant without warning her of the possible adverse side effects of long-term use of the drug, such as addiction. She sought damages from the pharmacists for injuries resulting from her addiction to the drug.

The Supreme Court affirmed summary judgment in favor of the pharmacists. Addressing the issue for the first time, the court determined that "[r]equiring the pharmacist to warn of potential risks associated with a drug would interject the pharmacist into the physician-patient relationship and interfere with ongoing treatment. We believe that duty, and any liability arising therefrom, is best left with the physician." *McKee*, 113 Wn.2d at 712. The court noted that the physician is in the best position to determine the proper drug therapy and to decide how and when to inform a patient of its risks and benefits, and held:

> The pharmacist still has a duty to accurately *fill* a prescription, and to be alert for clear errors or mistakes in the prescription. The pharmacist does not, however, have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side

effects associated with a drug, either orally or by way of the manufacturer's package insert.

*McKee*, 113 Wn.2d at 720 (citation omitted).

While the PDR recommends using caution when prescribing indomethacin to a patient with coagulation defects, there are no absolute contraindications to prescribing indomethacin to a patient who is taking heparin. There was thus no clear error or mistake in Mr. Silves' prescription for indomethacin. The pharmacist was under no duty to warn Mr. Silves.

### Pharmacist: Failure to consult with the physician

Mr. Silves argues that the pharmacist was negligent for failing to warn Dr. King of the potential interactions between indomethacin and heparin and to question Dr. King's prescription of indomethacin prior to dispensing the drug to Mr. Silves. As discussed above, there was no clear error or mistake in the indomethacin prescription. The pharmacist had no duty to question Dr. King's judgment. *McKee*, 113 Wn.2d at 720.

In any event, the element of proximate cause is absent. It is undisputed that Dr. King was aware that Mr. Silves was taking heparin and nevertheless believed that it was appropriate for him to take indomethacin for his symptoms. The record also shows that upon hearing this from Dr. King, the pharmacist would have filled the prescription for indomethacin, because there are no absolute contraindications to doing so. The pharmacist's failure to consult with Dr. King thus cannot have been a proximate cause of Mr. Silves' injuries because indomethacin would have been prescribed and dispensed in any event.

Mr. Silves argues that summary judgment was improper because Dr. King's credibility was at issue with respect to her statement that had the pharmacist contacted her, she would have reiterated her prescription for indomethacin. We disagree.

A genuine issue of credibility should not be resolved at summary judgment. *Amend v. Bell*, 89 Wn.2d

124, 129, 570 P.2d 138, 95 A.L.R.3D 225 (1977). However, credibility issues must be based on more than argument or inference on collateral matters. *Amend*, 89 Wn.2d at 129. Here, Mr. Silves attacks Dr. King's credibility by arguing that his experts dispute her decision to prescribe indomethacin in the first place. Although the experts' testimony puts Dr. King's professional judgment at issue with respect to her decision to prescribe indomethacin to a patient who is taking heparin, nothing in the record puts her credibility at issue regarding her statement as to what she would have done had the pharmacist questioned her decision before filling the prescription. Summary judgment dismissing the claims of pharmacist negligence was proper.

### Nurse: Failure to inform and to review discharge instructions

■ Mr. Silves claims that the discharge nurse had a duty to inform Mr. Silves of possible harmful interactions between indomethacin and heparin. We disagree, primarily for the reasons upon which the court in *McKee* based its conclusion that a pharmacist is not under a comparable duty:

> Proper weighing of the risks and benefits of a proposed drug treatment and determining what facts to tell the patient about the drug requires an individualized medical judgment based on knowledge of the patient and his or her medical condition. The physician is not required to disclose all risks associated with a drug, only those that are material. It is apparent that a pharmacist would not be qualified to make such a judgment as to materiality.

*McKee*, 113 Wn.2d at 711-12 (citing *Smith v. Shannon*, 100 Wn.2d 26, 31, 666 P.2d 351 (1983)). Just as a pharmacist is not qualified to make the judgment as to materiality, neither is a nurse. The duty to warn a patient of potential risks associated with a drug remains with the physician.[1]

---

[1] We note that there arguably may be circumstances under which a nurse, like a pharmacist, has a duty to warn a patient of a possible risk, such as where there is a need for corrective measures in the face of a clear error or mistake in the pre-

This situation is indistinguishable from that of the pharmacist. Imposing an independent duty on the nurse to warn a patient of potential harmful risks associated with a drug would impermissibly interfere with the physician-patient relationship.[2]

Mr. Silves also argues that the discharge nurse had a duty to review the discharge instructions with him orally to ensure that he understood them.[3] He submitted the affidavit of a nurse stating that the standard of care in Washington requires that a discharge nurse "personally review and go over with the patient the matters set forth on the hospital discharge instructions," specifically including all medication warnings, and discuss them with the patient.

Whether a duty of care exists is first a question of law. *Folsom v. Burger King*, 135 Wn.2d 658, 671, 958 P.2d 301 (1998), *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984). The relevance of the nurse's affidavit as to the standard of care depends on whether a legal duty is imposed on the discharge nurse. *See McCluskey v. Handorff-Sherman*, 125 Wn.2d 1, 6, 882 P.2d 157 (1994) (an action for negligence does not lie unless the defendant owes a duty of care to the plaintiff). We decline to impose such a duty in these circumstances.

Mr. Silves signed the discharge instructions under the statement: "I have received and can read the above instruc-

scription. This is not the situation presented here, however, and we need not and do not decide that issue.

[2]To the extent Mr. Silves argues that the nurse had a duty to obtain his informed consent to the treatment outlined in the discharge instructions, his argument is foreclosed by *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 55, 785 P.2d 815 (1990) (absent extraordinary circumstances, duty to obtain informed consent under RCW 7.70.020(3) is physician's).

[3]Mr. Silves objects to the trial court's determination of this issue because the hospital did not raise this issue in its motion for summary judgment. (The hospital focused its arguments on proximate cause.) But the trial court did not err in reaching the question of the existence of a duty, which is firstly a question of law. *Folsom v. Burger King*, 135 Wn.2d 658, 671, 958 P.2d 301 (1998); *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d 621 (1994). In addition, we may affirm the trial court on any theory supported by the pleadings and proof. *Weiss v. Glemp*, 127 Wn.2d 726, 730, 903 P.2d 455 (1995). Plaintiffs extensively briefed the standard of care issue below.

tions . . . . I agree with the plans outlined above." There is nothing in the record to suggest that Mr. Silves was not capable of doing so. The duty to ascertain and warn of material risks belongs to the physician. It is not ordinarily an independent duty of the nurse. *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 55, 785 P.2d 815 (1990). We decline to assign to the nurse an independent legal duty to undertake a personal review of instructions with each discharged patient, especially where there is no indication the written warnings will not effectively advise the patient.[4] Where a patient can read the instructions himself, there is no reason to require the nurse to read them for him.

Finally, we note that the jury found that Dr. King violated her duty to obtain Mr. Silves' informed consent, but that this failure was not a proximate cause of Mr. Silves' injury. The verdict necessarily amounts to a finding that indomethacin was not a proximate cause of injury. Therefore, even assuming the truth of Mr. Silves' claim that he would not have taken the indomethacin had the nurse reviewed the discharge instructions with him, the nurse's failure to do so could not be a proximate cause of his injury.[5]

### Nurse: Failure to consult the physician

Mr. Silves also argues that the nurse had a duty to consult with Dr. King about the potentially harmful effects of indomethacin. We decline to impose such a duty here, for the reasons earlier discussed as to whether the pharmacist had such a duty: the prescription contained no clear error or mistake. We also doubt the propriety of imposing on a discharge nurse the duty to recognize such an error or mistake even if it exists, but we need not address that is-

---

[4]Given the facts presented here, we need not and do not address the scope of a nurse's duty with respect to reviewing discharge instructions where the nurse has or should have knowledge that the patient will not or cannot independently review the written discharge instructions.

[5]By the same reasoning, any alleged failure of the pharmacist associated with filling the prescription for indomethacin was also not a proximate cause of Mr. Silves' injury.

sue here. Summary judgment was properly entered in favor of the hospital as to Silves' claims regarding the alleged negligence of the discharge nurse.[6]

### Appeal of Judgment in Favor of Physician

The sole issue Mr. Silves raises on appeal with respect to the judgment in favor of Dr. King is that the trial court erred by refusing to admit Exhibit 10. Exhibit 10 is the medical record compiled by Mr. Silves' employer, Intalco Aluminum Corp., from 1968 until the end of his employment. It appears from the record that the trial court ruled Exhibit 10 inadmissible under the medical records exception to the hearsay rule, ER 803(a)(4).[7]

█ "Admission of evidence lies within a trial court's discretion. As such, it is reviewed for abuse of discretion. Discretion is abused when it is exercised in a manifestly unreasonable manner, or based on untenable grounds or reasons." *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107, 864 P.2d 937 (1994) (citations omitted).

█ Intalco's plant physician testified that he neither diagnosed nor treated Mr. Silves, but rather just evaluated whether he was capable of returning to work after absences for medical reasons. Thus, statements to the plant physician recorded in Exhibit 10 were not made for purposes of medical diagnosis or treatment, and the exhibit was therefore not admissible under the medical records exception. There was no abuse of discretion in refusing it.

Mr. Silves argues on appeal that Exhibit 10 should have

---

[6]The record shows that Dr. King would have prescribed the indomethacin even if the nurse had questioned the prescription, and the verdict shows that indomethacin was not a proximate cause of injury to Mr. Silves. The nurse's failure to consult with Dr. King was therefore not a proximate cause of Mr. Silves' injuries.

[7]Under ER 803(a)(4), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule.

been admitted under the business records exception to the hearsay rule, ER 803(a)(6), and the Uniform Business Records as Evidence Act, RCW 5.45.020. It does not appear from the record, however, that Mr. Silves made an offer of proof as to why Exhibit 10 was admissible under this exception. Rather, the trial court seems to have excluded the exhibit solely under the medical records exception.

One of the purposes of an offer of proof is to create a record adequate for review. *Adcox v. Children's Orthopedic Hosp.*, 123 Wn.2d 15, 26, 864 P.2d 921 (1993). We are unable to ascertain whether the trial court considered the admissibility of Exhibit 10 under the business records exception and, if it did, the reasons the exhibit was not admitted. Nevertheless, we find that even if Exhibit 10 had been properly offered under the business records exception and even if its exclusion under that exception were error, such error is not grounds for reversal.

If the erroneous exclusion of evidence did not affect the outcome of the trial, the error is harmless. *Brothers v. Public Sch. Employees*, 88 Wn. App. 398, 408-09, 945 P.2d 208 (1997). Mr. Silves' medical condition since 1968, as chronicled in Exhibit 10, is not probative of whether the prescription of indomethacin was the cause of his September, 1992 pulmonary hemorrhage. Rather, Exhibit 10 is relevant only to a determination of the damages Mr. Silves suffered as a result of the alleged negligence. The jury did not reach the issue of damages because it found no proximate cause. Thus, the exclusion of Exhibit 10 could not have affected the outcome of the trial and any error in its exclusion was harmless.

Further, even if a portion of Exhibit 10 were relevant to proximate cause, the exhibit was cumulative of other testimony as to Mr. Silves' recent medical condition and treatment. *See Kimball v. Otis Elevator Co.*, 89 Wn. App. 169, 173, 947 P.2d 1275 (1997) (the erroneous exclusion of cumulative evidence is harmless error). The testimony of several witnesses, such as Dr. Walter Meeser, Dr. Steven Springmeyer, and Dr. Donald Berry, established

the conditions and treatment of Mr. Silves for a number of years prior to the 1992 hemorrhage. Exhibit 10 is cumulative of this testimony.[8]

We therefore affirm the judgment entered in favor of Dr. King.

Affirmed.

KENNEDY, C.J., and COX, J., concur.

---

[8]We recognize that the testifying physicians began treating Mr. Silves in the 1980s, whereas Exhibit 10 contains notations of his medical condition beginning in 1968. We are satisfied that given the physicians' testimony, the outcome of the trial would not have been different had the jury examined evidence of Mr. Silves' medical condition from 1968 until the testifying physicians began their treatment in the early 1980s.