[No. 23031-3-II.   Division Two.   July 16, 1999.]

CHARLES PRICE, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent*.

*Philip James Buri* of *Brett & Daugert, L.L.P.*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Jefffrey A.O. Freimund, Assistant*, for respondent.

SEINFELD, J. — Charles and Jackie Price sued the State of Washington for wrongful adoption, contending that the State Department of Social and Health Services (DSHS) failed to disclose relevant information about their adopted son. The trial court dismissed the action on the State's summary judgment motion, concluding that the statute of limitations barred the lawsuit. The Prices appeal. Finding disputed issues of material fact as to when the Prices knew

or could have known the factual basis for their claim, we reverse.

## FACTS

When the Prices contacted DSHS about adopting a child, they explained to the caseworker that their own severely handicapped child, who had Down's syndrome, suffered a painful death and they were interested only in a physically, mentally, and emotionally healthy child. In April 1981, the caseworker contacted the Prices and told them about C., a 20-month old boy who was available for adoption.

The caseworker gave the Prices only the following documents: an Adoptive Child Registration; a Child's Medical Report; and a letter dated November 4, 1980, from Dr. Isaac Pope to C.'s DSHS caseworker. The Adoptive Child Registration contained this description of C.:

> [C.] is now a very happy child who enjoys the older children in the foster home plus all the attention he receives. . . . [C.] is still a bit insecure and will likely have some adjustment problems in going into an adoptive home. He was diagnosed as failure to thrive at 2 months and has been in foster care since.

Clerk's Papers at 415. The Registration listed C.'s mental functioning and motor development as average.

The family medical history portion of the Child's Medical Report indicated the following:

> [C.'s] mother has had severe psychological problems since childhood, came from an abusive situation. [C.'s] maternal grandmother and great grandmother had diabetes. [C.'s] father has four brothers who are slightly to moderately retarded.

Clerk's Papers at 417-18. The Report also indicated that C.'s mother had been suicidal and had two maternal uncles who committed suicide.

The treatment portion of the Medical Report indicated that C. had been hospitalized at two-and-a-half months and subsequently received physical therapy for several months;

the final diagnosis was gross motor delay because of under stimulation and/or malnutrition. The Report indicated, however, that his "growth and development" as of March 1981 was "[n]ormal." Dr. Pope's letter indicated that, in his opinion, C.'s gross motor delay was a result of under stimulation and/or maltreatment and, thus, a previous cerebral palsy diagnosis should be eliminated from C.'s records.

After reviewing these documents, the Prices discussed the implications of C.'s family medical history with the caseworker who, according to Mr. Price, assured them that C. was not retarded and that the birth mother's problems were due to an abusive environment. Thus, those problems would not recur in C. The caseworker also told the Prices that she had provided all the relevant information that she had received regarding C. Relying on the caseworker's and Dr. Pope's assurances that C. was normal, the Prices adopted him in October 1981.

During the two years following C.'s adoption, C.'s pediatrician observed no abnormalities and noted he appeared normal. In 1984, when C. was five years old, a neurologist evaluated him and prescribed a medication for hyperactivity, although he concluded that C. had no evidence of neurological defects. Then when C. was about eight or nine, a psychologist diagnosed him as having a conduct disorder.

As C. grew older, his conduct became increasingly destructive and uncontrollable. He physically assaulted his parents, punched holes and wrote graffiti on the walls in his room, set fires, mistreated animals, and cut himself with a razor. Although medical specialists prescribed numerous medications, they were not able to explain what was wrong with C. Finally, in 1994, when C. was about 14 years old, medical specialists at Oregon Health Sciences University diagnosed him as suffering from fetal alcohol effects.

Meanwhile, during the time C.'s problems were developing, the Prices repeatedly sought more information from DSHS about C.'s biological parents. After each request,

DSHS either assured the Prices that they had all the available records or told them that the records were closed.

Eventually, the Prices hired a lawyer to assist them in obtaining special education services for C. In 1989, DSHS provided the Prices with 16 additional pages of documents including:

(1) C.'s hospital birth records indicating that he was a "normal" male infant in good condition on discharge although "small for dates" and jaundiced. These records indicate that the mother did not use drugs during pregnancy; the inquiry regarding alcohol use is blank.

(2) Dr. Penalver's handwritten treatment notes regarding C.'s hospitalization at Good Samaritan Hospital when he was two-and-a-half months old.

(3) an evaluation report, dated November 1979, by C.'s occupational therapist at Good Samaritan Hospital. The foster mother had reported that C. had been left unattended for 48 hours. When he was first taken to the receiving home, his body was "stiff all over and his hands were tightly fisted." The foster mother also reported that at times C.'s whole left side "seems to tighten up and becomes less resistant to movement." The therapist summarized as follows:

> it is felt that this is a developmentally at risk child who would benefit from being in a stimulating and caring environment. Considering the emotional and nutritional insult that this child has had to his system, it is not uncommon to have residual increased tone. Hopefully, this abnormal tone will diminish. In the meantime it is felt that this child should be monitored on a twice monthly basis.

Clerk's Papers at 450.

(4) a letter from C.'s therapist to Dr. Penalver, dated December 1979, indicating that C. was doing surprisingly well but expressing some concern about his condition. The therapist specifically states: "I feel quite leary [sic] about this developmentally 'at risk' child going back to his original home at this point."

(5) a letter from C.'s child welfare caseworker to Dr. Florence Greff, dated December 1979, where the caseworker states:

From what information I have been able to gather, this family has had a lot of problems in the past. [C.'s biological mother] evidently spent some time at Western State Hospital and Maple Lane School, and alludes to several suicide attempts and drug usage in the past. . . .

When [C.] was placed in care, he appeared to be undersized, and rather listless and unresponsive. When seen by a physician a few days after placement, he was found to be 9 lbs. 2 oz., which he stated was below the third percentile for his age. . . . Since being in care, [C.] has flourished, and gained 3 lbs. 4 oz. in a little less than 4 weeks. He is also far more responsive than he was at first. He has been found to have cerebral palsy (which evidently affects his left side) and is receiving periodic physical therapy for this.

Clerk's Papers at 449.

(6) a progress report and discharge summary prepared by C.'s occupational therapist at Good Samaritan Hospital dated March 1980. The therapist recommends that C. be seen by "either a physical therapist or an occupational therapist who is neurodevelopmentally trained."

About 1990 or 1991, when C. was about 11 years old, the Prices attended a seminar regarding fetal alcohol effect or fetal alcohol syndrome and concluded that this was a "possible" explanation for C.'s problems. At the seminar, the Prices met adoptive parents who were in litigation "trying to find out what really had happened to their adoptive children." According to Mr. Price, at least one person was alleging that DSHS had not provided adequate information.

In July 1991, the Prices applied for public assistance under the Adoption Support Reconsideration Program. They listed C.'s special needs as hyperactivity, attention deficit disorder, and "possible" fetal alcohol or drug syndrome. In September 1991, the Prices wrote an angry letter to DSHS caseworkers "relinquishing" their custody

and liability for C. to the State and stating "we where [sic] not told of [C.'s] problems when he was adopted nor [were] we offered any adoption support to help him." In 1992, the Prices continued to request any and all files on C. "that relate to his condition both Physical and Mental before and after his adoption in [1981]."

Finally, in July 1994, DSHS turned over C.'s entire 300-page file to the Prices. In this file, the Prices discovered for the first time the existence and name of C.'s biological aunt, Rebecca Ketchum.[1] The adoption file also contained a Guardian Ad Litem's (GAL) report for a June 1980 review hearing and a Dependency Review Report dated September 1980. The GAL's report includes the following statement:

Future prognosis is difficult at this time, but considering ongoing and consistent care and follow up, [C.] has the potential to be "mildly or minimally" disordered. Most likely having some difficulties with athletic movements such as running. He should overcome his neurological disorders, but will probably always appear not quite normal.

Clerk's Papers at 432. The Dependency Review Report states:

[C.'s mother] has indicated that she wishes to sign relinquishment papers on [C.], releasing him for adoption. She states that she and [C.] are not bonded to each other and feels unable to provide care for a handicapped child.

Clerk's Papers at 427.

In December 1994, five months after receiving C.'s complete case file, the Prices filed suit against the State alleging negligence, fraud, and breach of contract.[2] In sup-

---

[1]At oral argument before this court, the Prices asserted that the adoption file disclosed in 1994 alerted them for the first time to the existence of C.'s biological aunt.

[2]Responding to the State's motion for summary judgment on the merits, the Prices conceded that the facts as developed through discovery did not support a cause of action for breach of contract or fraud. Thus, the only issue on appeal is whether the trial court properly dismissed the Prices' negligence cause of action based on the statute of limitations.

port of their negligence claim, the Prices alleged that DSHS breached its statutory duty to disclose all potentially relevant information about C.'s "medical condition, history and circumstances that might indicate that he was not or might not be a healthy, normal child." They further alleged that they would not have adopted C. if DSHS had disclosed all such relevant information.

During discovery, Ketchum advised the Prices that she had communicated the following information to a DSHS caseworker during the time period when DSHS was first placing C. in foster care:

(1) C.'s birth mother had previously been a patient at Western State Hospital, Maple Lane, and other treatment facilities;

(2) Since the age of 11, the birth mother had been a "hard core drug addict" and, during her pregnancy with C., took drugs including heroin, LSD, cocaine, and speed;

(3) Although Ketchum did not see the birth mother drink alcohol during her pregnancy, she had seen her drunk and was "sure" that she drank because "[t]his would have been consistent with her out-of-control lifestyle."

(4) The doctors told Ketchum that "C. was born with a serious handicap" and that he either had a stroke, lesions on the brain, or cerebral palsy.

(5) Upon learning that the birth mother was a heroin addict, C.'s doctors told Ketchum that, in their opinion, C.'s handicaps were caused by the mother's drug use during pregnancy.

The State moved for summary judgment based on the statute of limitations and on the merits. The State claimed that more than three years before filing suit, the Prices knew or should have known that the alleged wrongful act of incomplete disclosure had occurred. The State relied upon the following evidence:

(1) Jackie Price's deposition testimony where she indicates that in 1989 DSHS provided previously undisclosed information;

(2) The Prices' September 1991 letter to DSHS where they express their belief that DSHS did not tell them about C.'s problems;

(3) Mr. Price's deposition testimony about the seminar on fetal alcohol syndrome or effect that the Prices attended in 1990 or 1991;

(4) the Prices' July 1991 application for public assistance where they indicate that C. has "possible" fetal alcohol or drug syndrome.

In response, the Prices claimed that: (1) they did not learn critical information that would have caused them not to adopt C. had it been disclosed before the adoption until 1994; (2) because of DSHS's repeated assurances of complete disclosure, they had no factual basis before 1994 to conclude that DSHS had withheld material information; and (3) the 16 pages of documents received in 1989 "only confirmed what we had been told earlier about [C.'s] temporary physical problems." The trial court granted summary judgment to the State, concluding that the Prices had discovered their cause of action before December 1991, more than three years before filing suit.

The Prices appeal contending that the issue of when they discovered the factual basis for their cause of action was a disputed question of fact for the jury. They further allege that they did not and could not have discovered the birth mother's alcohol abuse during pregnancy until 1994 when DSHS disclosed its complete adoption file. The Prices also claim that the State should be equitably estopped from asserting the statute of limitations because its caseworker gave "false assurances" that C. was a normal healthy child and because the Prices diligently requested information.

## DISCUSSION

We review a decision granting summary judgment by engaging in the same inquiry as the trial court. *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 157, 961 P.2d 371 (1998). Summary judgment is proper if there are no genu-

ine issues of material fact and the moving party is entitled to judgment as a matter of law. *Schilling*, 136 Wn.2d at 157; CR 56(c). Summary judgment should be granted only if reasonable persons could reach but one conclusion after considering the evidence in the light most favorable to the nonmoving party. *Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998).

A cause of action against an adoption agency for the negligent failure to disclose medical and social information about the child falls within the general three-year statute of limitations. RCW 4.16.080(2).[3] Because both parties have assumed that the discovery rule applies, we also assume its applicability. *See* RAP 12.1(a); *Allen v. State*, 118 Wn.2d 753, 758 n.4, 826 P.2d 200 (1992).

Under the discovery rule, a cause of action does not accrue until the plaintiff knows, or through the exercise of due diligence, should have known the essential elements of the cause of action. *Allen*, 118 Wn.2d at 757-58; *Beard v. King County*, 76 Wn. App. 863, 867, 889 P.2d 501 (1995). The action accrues when the plaintiff knows or should know the relevant facts, regardless of whether the plaintiff also knows that these facts establish a legal cause of action. *Allen*, 118 Wn.2d at 758. Further, the cause of action accrues on the date the plaintiff, through the exercise of due diligence, should have discovered the factual basis for the action, even if actual discovery did not occur until later. *Id*.

One who has notice of facts sufficient to prompt a person of average prudence to inquire is deemed to have notice of all facts that reasonable inquiry would disclose. *Green v. A.P.C. (American Pharm. Co.)*, 136 Wn.2d 87, 100, 960 P.2d 912 (1998); *Vigil v. Spokane County*, 42 Wn. App. 796, 800, 714 P.2d 692 (1986). When an aggrieved party discovered or could have discovered the facts to support a cause of action

---

[3]RCW 4.16.080 provides in pertinent part: "The following actions shall be commenced within three years: . . . (2) An action for taking, detaining, or injuring personal property . . . or for any other injury to the person or rights of another not hereinafter enumerated."

is a question of fact. *Green*, 136 Wn.2d at 100; *Vigil*, 42 Wn. App. at 800.

■ To prove a wrongful adoption claim, a plaintiff must establish that the adoption agency breached its statutory duty of disclosure[4] and that such failure to disclose

---

[4]Former RCW 26.36.050 (1979), the adoption disclosure statute in effect in 1981, provided as follows:

> Every person, firm, society, association, or corporation receiving, securing a home for, or otherwise caring for a minor child shall transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption a complete medical report containing all reasonably available information concerning the mental, physical and sensory handicaps of said child. Said report shall not reveal the identity of the natural parents of the child but shall include any reasonably available mental or physical health history of the natural parents that needs to be known by the adoptive parents to facilitate proper health care for the child. RCW 26.36.030 and 26.36.060 [making it a gross misdemeanor to divulge the contents of adoption records without court order] shall not apply to any information made available by this section.

In 1984, the Legislature repealed former RCW 26.36.050 and enacted RCW 26.33.350, which stated:

> Every person, firm, society, association, or corporation receiving, securing a home for, or otherwise caring for a minor child shall transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption a complete medical report containing all reasonably available information concerning the mental, physical, and sensory handicaps of the child. The report shall not reveal the identity of the natural parents of the child but shall include any reasonably available mental or physical health history of the natural parents that needs to be known by the adoptive parents to facilitate proper health care for the child.

Laws of 1984, ch. 155, § 37.

In 1989, the Legislature enacted RCW 26.33.380, which stated:

> Every person, firm, society, association, or corporation receiving, securing a home for, or otherwise caring for a minor child shall transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption, a family background and child and family social history report, which includes a chronological history of the circumstances surrounding the adoptive placement and any available psychiatric reports, psychological reports, court reports pertaining to dependency or custody, or school reports. Such reports or information shall not reveal the identity of the natural parents of the child.

Laws of 1989, ch. 281, § 2.

Following amendments in 1989, 1990, 1991, and 1994, RCW 26.33.350 currently provides:

> (1) Every person, firm, society, association, corporation, or state agency receiving, securing a home for, or otherwise caring for a minor child shall

proximately caused plaintiff's damages. *See McKinney v. State*, 134 Wn.2d 388, 394-96, 950 P.2d 461 (1998) (recognizing for the first time that an adoption agency's negligent

transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption a complete medical report containing all known and available information concerning the mental, physical, and sensory handicaps of the child.

(2) The report shall not reveal the identity of the birth parent of the child except as authorized under this chapter but shall include any known or available mental or physical health history of the birth parent that needs to be known by the adoptive parent to facilitate proper health care for the child or that will assist the adoptive parent in maximizing the developmental potential of the child.

(3) Where known or available, the information provided shall include:

(a) A review of the birth family's and the child's previous medical history, including the child's x-rays, examinations, hospitalizations, and immunizations. After July 1, 1992, medical histories shall be given on a standardized reporting form developed by the department;

(b) A physical exam of the child by a licensed physician with appropriate laboratory tests and x-rays;

(c) A referral to a specialist if indicated; and

(d) A written copy of the evaluation with recommendations to the adoptive family receiving the report.

(4) Entities and persons obligated to provide information under this section shall make reasonable efforts to locate records and information concerning the child's mental, physical, and sensory handicaps. The entities or persons providing the information have no duty, beyond providing the information, to explain or interpret the records or information regarding the child's present or future health.

Following amendments in 1993 and 1994, RCW 26.33.380 currently provides:

(1) Every person, firm, society, association, corporation, or state agency receiving, securing a home for, or otherwise caring for a minor child shall transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption, a family background and child and family social history report, which includes a chronological history of the circumstances surrounding the adoptive placement and any available psychiatric reports, psychological reports, court reports pertaining to dependency or custody, or school reports. Such reports or information shall not reveal the identity of the birth parents of the child but shall contain reasonably available nonidentifying information.

(2) Entities and person obligated to provide information under this section shall make reasonable efforts to locate records and information concerning the child's family background and social history. The entities or persons providing the information have no duty, beyond providing the information, to explain or interpret the records or information regarding the child's mental or physical health.

failure to disclose information pursuant to RCW 26.33.350 is actionable and may result in liability). Here, the Prices' cause of action accrued when they knew or should have known that (1) DSHS failed to disclose at the time of adoption all of C.'s relevant health history, including the health history of his biological parents (breach); (2) they would not have adopted C. if they had known this information (proximate cause); and (3) the adoption of C. resulted in damages. The cause of action accrued regardless of whether they knew that these facts established a legal cause of action. *Allen*, 118 Wn.2d at 758.

The State claims that no later than July 1991, the Prices knew that (1) DSHS had not disclosed all of C.'s relevant health history at the time of his adoption; (2) the birth mother had used drugs in the past; (3) fetal alcohol effect or syndrome was a possible cause of C.'s problems; and (4) they had incurred substantial costs as a result of C.'s problems. The Prices contend that they were not on notice until July 1994 of DSHS's nondisclosure of certain information that would have changed their decision to adopt. Viewing the evidence in the light most favorable to the Prices, as we must on summary judgment, the record supports the Prices' assertion. *Reynolds*, 134 Wn.2d at 495.

Clearly, the Prices knew in 1989, when DSHS disclosed the 16 additional pages, that in 1981 DSHS did not disclose all of C.'s health history. But the 1989 information contained nothing about the birth mother's use of drugs or alcohol during the pregnancy or about the long-term prognosis that at best, C. would be only "mildly or minimally disordered" and would "probably always appear not quite normal."

In 1992, the Prices made "reasonable inquiry" relevant to the issue of nondisclosure; they requested all files on C. "that relate to his condition both Physical and Mental before and after his adoption in [1981]." *See Vigil*, 42 Wn. App. at 800 (one who has notice of facts sufficient to prompt a prudent person to inquire is deemed to have notice of all

facts reasonable inquiry would disclose). The State seeks to turn this diligence against the Prices, contending that it establishes the Prices knew or should have known that DSHS was continuing to breach its statutory duty to disclose all information. We disagree.

Arguably, it was not until 1994, when DSHS provided the complete file, that the Prices knew (1) that DSHS was continuing to breach its statutory duty to disclose *and* (2) that DSHS had concealed information that would have affected their adoption decision, thereby proximately causing their injury. Thus, reasonable minds could differ about whether, in 1991, the Prices knew or should have known sufficient facts to connect DSHS's nondisclosure to their decision to adopt C.

Contrary to the State's argument, evidence that the Prices knew in 1991 that (1) DSHS had breached its duty of disclosure, (2) fetal alcohol effect or syndrome was a possible cause of C.'s problems, and (3) they had incurred damages does not provide undisputed evidence that the Prices had notice of the factual basis of their claim. Although the Prices discovered previously undisclosed information in 1989, there is evidence that this information was not critical to their decision to adopt. There also is evidence that the information first disclosed in 1994 was critical to their adoption decision.

The hospital records disclosed in 1989 indicate that the birth mother did not use drugs during pregnancy and are silent about alcohol use. Further, the letters and reports prepared by C.'s occupational therapist related to C.'s gross motor delay, which allegedly was the result of under stimulation and/or malnutrition. DSHS disclosed this information in 1981 when the Prices adopted C. The letter from C.'s caseworker to Dr. Greff indicated only that the birth mother "alludes to . . . drug usage in the *past*." (Emphasis added.) None of this 1989 information informed the Prices that the birth mother abused alcohol or drugs *during* her pregnancy. And arguably the Prices made reasonable inquiry based on the information they did have. *Vigil*, 42 Wn. App. at 800.

The 1994 disclosures revealed the identity of the birth mother's biological sister. The law then deemed the Prices to have notice of the facts discoverable upon further inquiry, i.e., that the birth mother abused drugs and alcohol during pregnancy *and that DSHS had this information when the Prices adopted C. Green*, 136 Wn.2d at 96; *Vigil*, 42 Wn. App. at 800.

■ The State asks us to disregard the sister's declaration, contending "it is rife with inadmissible hearsay, improper lay opinions, conclusory statements, statements made without any foundation for personal knowledge and speculation." But the law does not define Ketchum's 1981 out-of-court statements to DSHS as hearsay because the Prices are not offering them for the truth of the matter asserted but rather to establish that DSHS was on notice of the biological mother's possible drug and alcohol abuse and failed to disclose this information to them. ER 801(c). *See State v. Lass*, 55 Wn. App. 300, 303-04, 777 P.2d 539 (1989) (out-of-court statements that are inadmissible to prove the truth of the matter asserted may be admissible for the more limited purpose of proving notice); *see also Silves v. King*, 93 Wn. App. 873, 970 P.2d 790 (1999) (issues of credibility should not be resolved at summary judgment).

Further, Ketchum's critical testimony relates to her observations of the mother's drug use and drunken condition during pregnancy and her testimony that she reported this behavior to DSHS at the time it was first placing C. in foster care. Ketchum bases these observations of her sister on personal knowledge; thus, they do not constitute lay opinion testimony or speculation. *See* ER 602; 701. *See State v. Craven*, 69 Wn. App. 581, 586, 849 P.2d 681 (1993) (a lay witness's conclusion regarding another person's behavior is admissible when prefaced by the witness's recounting of his or her personal observations that logically and reasonably support the conclusion).

Upon a close review of the evidence in the light most favorable to the Prices, we find genuine issues of material fact as to when the Prices knew, or through the exercise of

due diligence, should have known the facts relevant to their cause of action. Thus, we reverse the summary judgment and remand for further proceedings consistent with this opinion.

BRIDGEWATER, C.J., and MORGAN, J., concur.

Review denied at 139 Wn.2d 1018 (2000).