Botsford, J.
The plaintiff, Donald J. Giilis (“Giilis”), brought this action against the defendant, Walgreen Eastern Co., Inc. (“Walgreen”), for negligence (Count VII) and breach of contract (Count VIII). Presently before the court is Walgreen’s motion for summary judgment on Counts VII and VIII of Gillis’s complaint and Walgreen’s motion to strike the affidavit of Randy J. Averback, M.D.
For the reasons set forth below, Walgreen’s motion for summary judgment is allowed and Walgreen’s motion to strike is allowed.
BACKGROUND
The following facts are undisputed for purposes of the summary judgment motion. On July 1, 1997, Gerald S. Harris, M.D. examined Giilis, and prescribed Prednisone for pain. Dr. Harris’ notes concerning this visit state: “I have asked [Giilis] to take 100 milligrams daily for the next 5-7 days.” Dr. Harris’s office called the prescription into the Waltham Walgreen’s Pharmacy as 100 milligrams a day, to be taken as twenty milligram tablets, five times a day.[2] The prescription was for 100 pills of Prednisone (a twenty-day supply), with three refills. Dr. Harris stated at his deposition that it was his practice to over-prescribe medications so that the patient would have enough medication on hand, in the event that the doctor later changed the prescription dosage. The United States Pharmacopeia Dispensing Information (“USPDI”) gives the usual adult dose for Prednisone tablets as “5 to 60 milli *293 grams a day as a single dose or in divided doses.” The USPDI gives the usual adult prescribing limit for Prednisone tablets as 250 milligrams daily. Under 105 Code of Mass. Regs. 700.002, Prednisone is a Schedule VI drug. According to Cheryl Sullivan, Dr. Harris was an “established prescriber” in the Walgreen’s system.
Walgreen’s filled the prescription as called in by Dr. Harris’s office and dispensed the prescription to Gillis on July 3, 1997. According to Cheryl Sullivan, prescriptions go through two levels of verification at Walgreen’s pharmacies. These procedures are set forth in the Walgreen’s Corporation Standard Operating Procedures (“SOP”) manual, which is available in each Walgreen’s pharmacy. All staff pharmacists are expected to be familiar with the SOP manual.
The first level of verification is done by the intake pharmacist, who transcribes the telephone prescription. The intake pharmacist for Gillis’ Prednisone prescription was Kristen Latersa. This level consists of verifying the dosage of the chosen medication, checked against the USPDI if necessary. The verification is done while the intake pharmacist is on the telephone with the person who calls in the prescription, so that any questions about dosage can be verified at that time. The intake pharmacist is also responsible for putting the prescription into the Walgreen’s pharmacy computer system, and getting the telephone number for the physician, to be matched against the computer database.
The second level of verification is done after the prescription has been filled. The second verifier conducts the “prospective drug utilization review” (“DUR”) through the use of the Walgreen’s computer system. The verification pharmacist for Gillis’ Prednisone prescription was Nabil Al-Alem. The second verification consists of comparing the label on the prescription with the prescription that was called in to the pharmacy, and determining that the labels on the prescription and on the bag are correct. The second verifier can also check the dosage of the prescription in the USPDI. According to Cheryl Sullivan, when there is an incorrect prescription, the pharmacist will call the physician or physician’s representative to verify that the information received by the pharmacy is the correct prescription, as intended by the physician. If a pharmacist feels that a prescription is incorrect, even after speaking with the physician or physician’s representative, the pharmacist has the right not to fill the prescription. The Walgreen SOP manual does not include instructions for verifying unfamiliar callers with prescriptions for Schedule VI drugs.
On July 5, 1997, Gillis went to the Massachusetts General Hospital emergency room for pain. The Prednisone prescription was reviewed by the emergency room doctor and was not changed or discontinued. On July 12, 1997, pedestrians found Gillis unconscious in his car and he was taken to Deaconess Waltham Hospital by ambulance, where he was treated for massive upper gastrointestinal bleeding.
DISCUSSION
I. Summary Judgment
Summary judgment shall be granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Allstate Insurance Co. v. Reynolds, 43 Mass.App.Ct. 927, 929 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that, as a result, the moving party is entitled to summary judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defend [the] motion.” Id. at 17.
A pharmacy owes a customer a common law duty of reasonable care when dispensing prescription medications and filling prescriptions. See Andreotalla v. Gaeta, 260 Mass. 105, 109 (1927); Norton v. Sewall, 106 Mass. 143 (1870). This duty of reasonable care requires a pharmacy to fill prescriptions in accordance with the prescribing physician’s prescription. See Andreotalla, 260 Mass. at 109. See also Nesci v. Angelo, 249 Mass. 508, 511 (1924) (negligence for pharmacist to substitute medication contrary to physician’s prescription); Morgan v. Wal-Mart Stores, Inc., 30 S.W.3d 455, 461 (Tex.Ct.App. 2000) (pharmacy owed plaintiff a duty to dispense drug in accordance with doctor’s prescription).
A pharmacist’s duties in the filling of prescriptions are also statutorily prescribed in Mass. G.L.c. 94C, §§19 and 21 A. Of particular relevance here is the requirement that “[a] pharmacist shall conduct a prospective drug review before each new prescription is dispensed or delivered to a patient or person acting on behalf of such patient.” G.L.c. 94C, §21A. The standards for the prospective DUR are set out in detail in 247 Code of Mass. Regs. §9.07(2).[3] The purpose of the DUR is “to promote optimum therapeutic outcomes, avoid patient injury and reduce medication errors.” 247 Code of Mass. Regs. §9.07.
Walgreen argues it is entitled to summary judgment because (1) Gillis has no reasonable expectation of establishing that Walgreen breached the applicable standard of care relative to the filling of the July 3, 1997 prescription for Prednisone, and (2) Gillis has no reasonable expectation of proving that Walgreen’s claimed negligence caused his injuries. Gillis responds that there are material issues of fact in dispute about (1) whether Walgreen conducted a prospective DUR prior to dispensing the prescription to Gillis; (2) whether Walgreen conducted a review to determine if *294 the drug dosage of the prescription was correct; (3) whether Walgreen called Dr. Harris to confirm the prescription; and (4) whether the injuries suffered by Gillis were proximately caused by Walgreen’s failure to meet the standard of care established by federal and state law and regulations.
A. Negligence
Walgreen argues that claims of negligence or breach of contract cannot be sustained against a pharmacy where it accurately fills a prescription pursuant to the prescribing physician’s instructions and such a prescription does not contain clear or obvious errors. See Andreotalla, 260 Mass. at 109; Morgan, 30 S.W.3d at 467; Silves v. King, 970 P.2d 790, 794 (Wash. 1999). Under the “learned intermediary” doctrine, the prescribing physician, not the dispensing pharmacy, is in the best position to evaluate the potential risks and benefits of ingesting a certain drug. Garside v. Osco Drug, Inc., 976 F.2d 77, 80 (1st Cir. 1992); MacDonald v. Ortho Pharmaceutical Corp., 394 Mass. 131, 136-37 (1985). See also Brooks v. Wal-Mart Stores, Inc., 535 S.E.2d 55, 67 (N.C.App. 2000) (320 milligram daily dosage of prednisone is “so excessive as to not be a gray area”).
Here, there is no dispute that the Prednisone prescription fell within the permissible dosage level. The USPDI indicates that the usual adult prescribing limit for Prednisone is 250 milligram per day, and this prescription was for 100 milligrams per day. There is also no dispute that Dr. Harris intended to prescribe Prednisone. Since Walgreen properly filled a clear and accurate prescription, it has met its duty to Gillis.
Gillis does not dispute the common law duties of a pharmacist as detailed by Walgreen, but rather argues that Walgreen’s actions in this case violated the duties of a pharmacy as codified in G.L.c. 94C, §§19 and 21A and in 247 Code Mass. Regs. §9.07. Gillis argues that by not following the claimed regulatory requirement to verify the prescription by calling Dr. Harris, Walgreen breached its duty to Gillis. See Matteo v. Livingstone, 40 Mass.App.Ct. 658, 659 (1996) (“The violation of a statute or regulation, while not conclusive of civil liability, constitutes evidence of negligence of the person who has violated the statute or regulation as to consequences that the statute or regulation was intended to prevent”). Gillis also argues that the Walgreen’s pharmacists failed to follow Walgreen’s SOP manual for the filling of new prescriptions and that this failure, too, is sufficient evidence of negligence to withstand summary judgment.
The language of247 Code Mass. Regs. §9.07(2) does not mandate a telephone call to the prescribing physician, however, but rather suggests such a call as an option for fulfilling the requirements of the prospective DUR. Cheryl Sullivan testified that Walgreen’s SOP manual similarly does not require pharmacists to call physicians to clarify prescriptions. It is also undisputed that Dr. Harris was previously known to the Walgreen’s pharmacy in Waltham; that the prescription fell within the acceptable dosages for Prednisone; that Dr. Harris would routinely over-prescribe medications; and that Walgreen filled the prescription exactly as it was transcribed. Nevertheless, Gillis is correct that the summary judgment record may well not establish without dispute that either pharmacist actually conducted the' prospective DUR that was required.[4]
B. Causation
I assume, therefore, a jury issue exists on the question of compliance with the prospective DUR regulations, and, arguably, on the issue of negligence. Gillis, however, also has not shown any ability to establish causation. Gillis bears the burden of showing a causal connection between Walgreen’s alleged negligence and any harm suffered by Gillis. Joudrey v. Nashoba Community Hosp., Inc., 32 Mass.App.Ct. 974, 976 (1992). Walgreen’s conduct must have been a “substantial factor” in bringing about Gillis’ harm in order for there to be proximate cause. See Mullins v. Pine Manor College, 389 Mass. 47, 62 (1983). See also Walter v. Wal-Mart Stores, Inc., 748 A.2d 961, 968 (Me. 2000).
Dr. Harris stated in his deposition that he intended to give Gillis a prescription for Prednisone and that his practice was to give patients a larger than necessary dose of the given medication, to allow for changes in treatment. Cheryl Sullivan stated in her deposition that pharmacists do not consider refills in considering whether a prescription is within the standard dosage for a given drug.[5] The USPDI states that 100 milligrams daily of Prednisone is within usual adult prescription limits. The point is that even if there is a factual dispute concerning whether or how Walgreen’s pharmacists conducted the prospective DUR, the undisputed facts demonstrate that this alleged failure was not causally connected to Gillis’ injuries, because a review fully conducted in accord with the regulations and Walgreen’s own SOP would not have led the pharmacists to do anything but fill the prescription as received by telephone from Dr. Harris’ office. See Silves v. King, supra, 970 P.2d at 794 (pharmacist’s failure to consult doctor not proximate cause where drug “would have been prescribed and dispensed in any event”). Walgreen’s motion for summary judgment on counts VII and VIII of Gillis’s complaint will be allowed.
II. Motion to Strike
Walgreen moves to strike the affidavit of Randy J. Averback, M.D., arguing that Dr. Averback is not qualified to testify as an expert relative to the standard of care of a pharmacist.
Where an affidavit is submitted by a purported expert at summary judgment, the affidavit must affirmatively demonstrate that the affiant is competent to testify to the matters stated therein. See Mass.R.Civ.P. 56(e). To determine whether a witness is qualified to give an expert opinion, the court must *295 determine “whether the witness had sufficient ‘education, training, experience and familiarity with the subject matter of the testimony.’ ” Letch v. Daniels, 401 Mass. 65, 68 (1987) (citation omitted).
A “pharmacist is a professional who has a duty to his customer to exercise the standard of care required by the pharmacy profession in the .same or similar communities as the community in which he practices his profession.”Dooley v. Everett, 805 S.W.2d 380, 385 (Tenn.App. 1991). The standard of care required by a pharmacist “must be established by the testimony of experts who practice in the same field.” McKee v. American Home Products, 782 P.2d 1045, 1048 (Wash. 1989).
Dr. Averback's affidavit states that she is "a practicing internist with a subspeciality in cardiology.” She provides no evidence of any education, training, experience or familiarity with retail pharmacies or as a pharmacist. Therefore, Dr. Averback is not qualified to testify as to the standard of care owed by a pharmacy or pharmacist and Walgreen’s motion to strike her affidavit from the summary judgment record will be allowed.
ORDER
For the foregoing reasons, Walgreen’s motion for summary judgment is allowed and Walgreen’s motion to strike the affidavit of Randy J. Averback, M.D. is allowed.

 The summary judgment record indicates that Dr. Harris’ office had a policy that required the physician to be consulted before any prescription was telephoned in to a pharmacy.

 (2) Prospective Drug Utilization Review.
(a) A pharmacist shall conduct a prospective drug utilization review (“DUR”) before each new prescription is dispensed or delivered to a patient or a person acting on behalf of the patient. This DUR may include a review of the patient record and each new prescription presented for dispensing, for the purpose of promoting therapeutic appropriateness, by making a reasonable effort to identify the following: 1. over-utilization or under-utilization; 2. therapeutic duplication; 3. drug-disease contraindication; 4. drug-drug interaction; 5. incorrect drug dosage or duration of drug treatment; 6. drug-allergy interactions; 7. clinical abuse or misuse; and 8. any significant change in drug, dose or directions.
(b) Upon identifying any of the above, the pharmacist shall take appropriate measures to ensure the proper care of the patient which may include consultation with the prescribing practitioner and/or direct consultation with the patient.
(c) The review shall be based upon current standards which may include the following: 1. The American Hospital Formulary Service Drug Information; 2. The United States Pharmacopoeia Drug Information; 3. the American Medical Association Drug Evaluations; and 4. other peer-reviewed medical literature.
247 Code of Mass. Regs. §9.07(2).

 There is no direct evidence in the summary judgment record of what either pharmacist did. Chery Sullivan, the pharmacy manager, was testifying about general business practices; she was not present in the pharmacy on July 3, 1997. While Sullivan’s testimony may be admissible as evidence of general business custom, see O’Connor v. Smithkline Bio-Science Laboratories, Inc., 36 Mass.App.Ct. 360, 365 (1994), it seems insufficient by itself to satisfy Walgreen’s summary judgment burden.

 Gillis emphasizes that the prescription inclusive with the three refills would have given him pills for eighty days, a period well beyond the usual prescription limit. But since Gillis was found unconscious on July 12, 1997, only nine days after his prescription was filled, it is not necessary to reach the issue of the refills.