IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JOHN NORTON and KRISTINE )   No. 72818-1-I
NORTON, individually, and derivatively )
on behalf of LARCO-BOLIVAR )   DIVISION ONE
INVESTMENT, LLC and SHELL LA )
PAZ, LLC; NORTHLAND CAPITAL, )
LLC, individually, and derivatively on )
behalf of NDG-BRYCON, LLC; and )
P.R.E. ACQUISITIONS, LLC, )
)   UNPUBLISHED OPINION
              Appellants, )
)
        v. )
)
GRAHAM AND DUNN, P.C., a )
Washington professional corporation, )
)
          Respondent. )   FILED: April 18, 2016

SCHINDLER, J. — John and Kristine Norton, individually and derivatively on behalf

of Larco-Bolivar Investment LLC and Shell La Paz LLC; Northland Capital LLC,

individually and derivatively on behalf of NDG-Brycon LLC; and P.R.E. Acquisitions LLC

(collectively, Norton) appeal summary judgment dismissal of claims against Graham &

Dunn PC as barred by the three-year statute of limitations. Because the undisputed

record shows Norton knew or in the exercise of due diligence should have known the

facts to timely file claims against Graham & Dunn alleging violation of the Washington

State Securities Act (WSSA), chapter 21.20 RCW; and aiding and abetting fraud, we affirm.

NDG Investments

John Norton owned a majority interest in Snelson Companies Inc. (Snelson). In early 2000, Norton hired business consultant William Prater "to evaluate my company and its performance and operations to see if I could improve its efficiency." According to Norton, Prater worked for Snelson "off and on" until 2006 or 2007.

Jose Luis Nino de Guzman Jr. is a former U.S. Bank employee and Peruvian national. In 2006, de Guzman left U.S. Bank to establish an investment company to engage in real estate development in Peru, NDG Investment Group LLC (NDG). Beginning in 2007, Prater worked as a business consultant for de Guzman and NDG. De Guzman planned to sell membership interests in limited liability companies (LLCs) to investors and use the money to purchase property for designated real estate projects in Lima, Peru. De Guzman formed Grupo Innova SA to act as the local real estate developer for NDG in Lima. The investors would receive the net proceeds after the development projects were sold.

On May 9, 2007, de Guzman and NDG retained the law firm of Graham & Dunn PC to form LLCs for designated real estate projects in Peru. In 2007, Graham & Dunn formed the first Delaware LLC for Arequipa LLC, a plan to develop a condominium project in Lima, Peru. In December 2007, NDG began selling membership interests in Arequipa LLC to investors.

In 2008, Prater suggested Norton and his business associates "consider investing in some of the projects" de Guzman was "putting together." According to

Norton, "Prater provided us with contact information of the appropriate representatives of NDG, their website and other information to facilitate our review." The NDG website stated that de Guzman founded NDG and Grupo Innova to develop "high quality housing, while also providing sustainable opportunities for American investors." The NDG website also identified Graham & Dunn as one of its "Partners" providing "all NDG legal work in the US." Norton said that according to the "promotional and investment materials," investor "returns of approximately 35 to 50% were to be expected and would be paid when the project was built out and sold, typically in 14 to 18 months."

Norton decided to purchase a membership interest in Larco-Bolivar Investment LLC (Larco-Bolivar LLC). Larco-Bolivar LLC planned to develop a commercial building in Lima, Peru. Norton signed the March 19, 2008 Larco-Bolivar LLC "Limited Liability Company Agreement" (LLC Agreement). The LLC Agreement states Graham & Dunn prepared the LLC Agreement and was acting as legal counsel "for the Company only." The LLC Agreement states the membership interests were not registered under federal or state securities laws and "[t]he availability of any exemption from registration must be established by an opinion of counsel."

> Federal Law Disclosure and Limitations. The Membership Interests have not been registered under federal or state securities laws. Membership Interests may not be offered for sale, sold, pledged, or otherwise transferred unless so registered, or unless an exemption from registration exists. The availability of any exemption from registration must be established by an opinion of counsel, whose opinion must be satisfactory to [NDG].

On May 3, Norton wired $200,000 to U.S. Bank "to purchase our membership interest in Larco-Bolivar."

3

In spring 2008, Norton and Prater formed an investment company, Northland Capital LLC (Northland). Norton and Prater each owned a 50 percent interest in Northland. The partners agreed Prater would identify investments, Norton would fund the investments, and they would "split the profits."

After months of negotiation, on July 2, 2008, Norton sold Snelson for $76.4 million. On July 3, Graham & Dunn formed Shell La Paz LLC to develop a commercial building in Lima, Peru. Norton decided to invest in Shell La Paz LLC. Norton signed the July 3, 2008 Shell La Paz LLC Agreement and wired $500,000 to U.S. Bank to purchase his membership interest in the LLC.

On July 14, 2008, Graham & Dunn formed NDG-Brycon LLC to develop low cost housing real estate projects in Peru. On July 15, Northland wired $500,000 to U.S. Bank to purchase a 50 percent membership interest in NDG-Brycon LLC resulting in a "ten percent (10%)" ownership interest in Brycon International.

Graham & Dunn formed four more LLCs for de Guzman and NDG in 2008. On August 18, Graham & Dunn formed NDG-Brycon 2 LLC "to purchase an interest in Brycon International for the purpose of developing real estate projects in Peru." On September 2, Graham & Dunn formed Los Alamos Residential LLC "to fund development of a townhome complex in the Surco district of Lima." On November 5, Graham & Dunn formed Grau Residential LLC "to fund development of a 42-unit condominium in the Miraflores district of Lima." And on December 18, Graham & Dunn formed Jorge Chavez LLC "to fund development of a 39-unit condominium in the Miraflores district of Lima."

4

Graham & Dunn advised de Guzman and NDG that the LLCs were exempt from registration under Securities and Exchange Commission (SEC) Rule 506 of Regulation D if the membership interests were sold only to accredited investors, and a "Form D" was filed within 15 days after the first sale of securities with a balance sheet or financial statement by an independent accountant.

P.R.E. Acquisitions LLC

Toward the end of July 2008, Norton, Prater, and de Guzman agreed to form P.R.E. Acquisitions LLC (P.R.E.) to act as a "land bank" for the NDG and Grupo Innova real estate development projects.

> The concept was that P.R.E. would be given a markup on the land purchase and the LLCs would be guaranteed a price they could depend upon for the development and not be exposed to the rapidly raising prices in the marketplace in Peru. The general expected turnover on each land investment was 8 to 12 weeks, with no individual PRE investment to be tied up for more than 6 months.

Graham & Dunn formed P.R.E. as a Washington LLC. The Agreement designates de Guzman as the manager with responsibility for identifying and purchasing property that P.R.E. would "hold while the projects were planned by Grupo Innova and the funds were being raised in the U.S. by NDG." Northland owned 90 percent and de Guzman 10 percent of P.R.E.

Memorandum of Understanding

From the end of July through the beginning of November 2008, Northland wired approximately $9.8 million from P.R.E. to Grupo Innova in Peru to fund the purchase of properties for El Derby LLC, Los Alamos Residential LLC, El Incario LLC, and Grau Residential LLC.

In January 2009, Norton and Prater met with de Guzman in Peru to discuss the status of the P.R.E. investments. De Guzman admitted that without consulting Norton and Prater, he sold Los Alamos Residential LLC and used the funds to buy other properties.

> [De Guzman] represented (confessed) that he had sold Los Alamos Residential, LLC to the NDG development LLC and had used those funds to buy other properties he felt would be advantageous to P.R.E. (Malecon 28th of July, Juan de Arona 1, Juan de Arona 2, Javier Prado, Jorge Chavez and Casa Grande). Mr. de Guzman verbally provided details as to the properties purchased.

Norton and Prater acknowledged de Guzman "may have had the authority to do what he did . . . [s]ince he was the manager of P.R.E." but made clear "he did not have the approval of the primary investor (Northland)," and "expressed our disappointment and concern over his poor judgment." De Guzman "assured [Norton and Prater] that it would not happen again."

After returning to the United States, Prater, Norton, and Norton's attorney James Hadley at Ryan Swanson & Cleveland met with NDG investors and employees Darin Donaldson and Glenn Fulton on January 22, 2009 to discuss entering into a memorandum of understanding (MOU) to protect Northland's investment in P.R.E.

Following the meeting, Norton sent an e-mail to Prater with "comments & suggestions." In addition to requiring de Guzman to resign as the manager of P.R.E., Norton stated he must forfeit his 10 percent claim to "all PRE transactions (old and new) as a penalty." Norton asked Prater to e-mail him "a copy of the PRE operating agreement as well as any addendums, including the one changing the Manager and adding the funding protocols," and to "[k]eep me posted every step of the way." Norton also said his attorney may have other suggestions. "[M]y attorney . . . is thinking about

6

this situation both as my advisor and related to his own interests. He may have some other suggestions. If so I will forward."

On January 23, 2009, Norton sent Prater an e-mail about other provisions that should be included in the MOU. Specifically, requiring de Guzman to transfer financial authority to Fulton and Donaldson, requiring Graham & Dunn to cooperate with Norton's attorneys "on a drop-in or ongoing basis," and requiring de Guzman to disclose all financial and real property assets by January 31, 2009.

On January 23, de Guzman, Donaldson, Norton, and Prater asked Graham & Dunn attorney Nicolas Drader to draft the MOU. De Guzman agreed to reimburse P.R.E. for legal expenses.

During the January 23 meeting, de Guzman admitted he used P.R.E. funds to purchase property in Peru "other than those that Northland Capital had intended to be purchased." Graham & Dunn attorney Drader acted as counsel for NDG, and Norton's lawyers at Ryan, Swanson & Cleveland represented Norton and Northland. Drader testified, in pertinent part:

> Graham & Dunn acted as counsel for NDG in connection with this work. The law firm of Ryan, Swanson & Cleveland acted as counsel for Northland Capital and Norton. . . . Darin Donaldson at NDG took primary responsibility for drafting a "Liquidation Plan" to be attached as an exhibit to the MOU, which would describe the process by which De Guzman's misuse of P.R.E.'s funds would be remedied.

According to Drader, other provisions were later added to protect Northland and Norton including confirmation of "the status of ownership of the Peruvian properties" and requiring NDG "to engage [bilingual accountant] PricewaterhouseCoopers to conduct a

forensic review of the expenditure of P.R.E.'s funds."

> The MOU required De Guzman to personally guarantee any losses incurred as a result of his misuse of P.R.E.'s funds. It also required NDG to pay Northland Capital's expenses associated with De Guzman's misuse of P.R.E.'s funds, and required De Guzman to forfeit his interest in P.R.E., leaving Northland Capital as P.R.E.'s sole member. It also required NDG and De Guzman to use Peruvian counsel to confirm the status of ownership of the Peruvian properties, and required NDG to engage PricewaterhouseCoopers to conduct a forensic review of the expenditure of P.R.E.'s funds. Finally, the MOU required that De Guzman's signing authority over all project-related bank accounts be transferred to Donaldson and Fulton.

NDG paid Norton $110,000 for his legal fees.

Discovery of the Ponzi Scheme

After entering into the MOU, NDG employees Donaldson and Fulton attempted to determine the status of the development projects and financing for each of the LLCs. Donaldson and Fulton provided Prater and Norton with information about the LLC investments. Norton and his lawyers "continued to review information obtained through cooperation with officers of NDG." According to Norton, he and his attorney "continued to discover . . . the inappropriate nature" of de Guzman's business dealings in the United States and Peru.[1]

On March 11, 2009, Prater sent Norton an e-mail stating de Guzman admitted to Fulton that he was "running a financial house of cards" and diverting investor funds.

> [Fulton] has confirmed that [de Guzman] has admitted to have been running a financial house of cards. The so called "Mystery Account" has been used by [de Guzman] to raise money from unsuspecting investors in a variety of ways. Generally he has been concealing limited partnerships between one investor and NDG with about one year terms and about a

---

[1] Norton testified, in pertinent part:

Mr. Prater and I, along with my legal team at Ryan Swanson & Cleveland, PLLC in Seattle, continued to review information obtained through cooperation with officers of NDG and continued to discover, over an extended period of time, the inappropriate nature of Mr. de Guzman's business in both the U.S. and Peru.

50% profit component. [Illegible] [De Guzman] states that the financial liability to NDG is about $2.5 million and there are a couple of dozen individuals involved.

[De Guzman] has used these funds in a variety of ways. These have ranged from financing his personal extravagant lifestyle to repaying investors in previous deals. Very sad and I wish it was not true. The number of disclosures from [de Guzman] keep growing and none are good. He has proven himself to be a very accomplished liar and con man.

On April 10, 2009, Lane Powell PC attorney Christopher Wells on behalf of NDG investor employees Darin Donaldson, Glenn Fulton, and Philip Boos sent a letter to Graham & Dunn attorney Drader demanding "Grupo Innova/NDG/De Guzman" provide documents by April 14 including "[t]itle reports on each LLC's real property," bank loan documentation on construction "described in each LLC's offering memorandum," cancelled checks, wire transfer records, and proof of ownership interests in NDG-Brycon LLC and NDG-Brycon 2 LLC.[2] The letter asks NDG to maintain all business records including electronic documents. "Please assist with any requirements to preserve email on NDG's servers, and tell us what steps NDG has already taken to preserve records." The letter also states the NDG employees retained Blank Law + Tech to copy the contents of employee computer hard drives and asks NDG to "preserve copies of all NDG and related LLC records at Graham and Dunn." The letter

---

[2] The letter identifies the money the NDG employees invested in the LLCs.

1. Philip Boos: $25,000 in NDG - Brycon 2, LLC, which is not among the Innova Affidavit twelve; Mr. Boos' parents, however, have also invested $50,000 in NDG - Brycon 2, LLC plus another $225,000 in two of the twelve LLCs in the Innova Affidavit, Ejercito Residential, LLC (Ejercito payout is past due) and Grau Residential, LLC;

2. Glenn Fulton: $50,000 in NDG - Brycon 2, LLC and $25,000 in Los Alamos Residential, LLC; and Mr. Fulton's parents and grandfather have collectively invested $540,000 in five of the twelve Innova LLCs, plus $50,000 in NDG-Brycon 2; and

3. Darin Donaldson: $13,000 in Los Alamos Residential, LLC; $60,000 paired with Matt Pelchat and invested in Ejercito Residential, LLC through Utilis Investment Group, LLC (Ejercito payout is past due); Mr. Donaldson's mother, brother and sister-in-law have invested another $100,000, in Los Alamos Residential, LLC and Grau Residential, LLC.

states the employees plan to report to the investors and "will be meeting with them after April 21." Norton's attorneys, Ryan Swanson & Cleveland attorney Hadley and Roger D. Mellem, are specifically identified as recipients of the letter.

Steering Committee

After Donaldson, Fulton, and Boos disclosed the fraud to the other NDG investors, a group of investors formed a "Steering Committee" to recover funds. Norton agreed to join the Steering Committee.

On June 11, 2009, Norton sent an e-mail to his attorney at Ryan Swanson & Cleveland expressing concerns about the Steering Committee's proposed allocation for the recovery of assets. Norton identifies a number of "Recovery Opportunities" in an attached "Allocation Worksheet"—"I've also updated the content and the format of the attached worksheet for your review. I know we need to discuss all this more." Norton specifically identifies "Claim Against [U.S. Bank]," "Claim Against [Graham & Dunn]," "Claim Against [De Guzman] & NDG," and "Claim Against Innova or Ownership of Innova" as Recovery Opportunities.

Norton participated in the decision to retain Sirianni Youtz Meier & Spoonemore (Sirianni) to represent the Steering Committee in the effort to recover investment funds. Norton paid $24,000 as his portion of the fee to retain Sirianni. On July 2, 2009, the Steering Committee sent an "NDG Recovery - Update" e-mail to the investors and answered some "common questions" including the status of Norton as an owner of Northland and P.R.E. "Per [Sirianni]: As to Norton, no one is giving up rights, which means the status quo is preserved. Norton could - with or without an agreement - argue that some of the LLC investors['] money is his."

On July 1, NDG employees produced "NDG and LLCs files and records" to Sirianni. The NDG files included e-mails from Graham & Dunn. On July 8, de Guzman waived attorney-client privilege and instructed Graham & Dunn to provide all of the requested documents including e-mails, internal memoranda, and attorney-client correspondence. On July 9, NDG sent Sirianni "CDROMs that were received from Graham and Dunn." On July 17, Graham & Dunn produced copies of additional e-mails located in the "MS Outlook folders" of individuals at the law firm who worked on "NDG Investment Group L.L.C. matters."

On August 25, 2009, Sirianni returned the $24,000 retainer to Norton. On September 9, the "Steering Committee for NDG Recovery Efforts" sent a letter to Norton and his attorneys at Ryan Swanson & Cleveland. The letter states irreconcilable conflicts of interest preclude proceeding "as a group" but if Norton decides to "file a suit that parallels ours[,] . . . our respective groups and lawyers will cooperate to the extent possible to seek and maximize recoveries." The letter states:

> September 9, 2009
>
> Ryan, Swanson & Cleveland, PLLC
> Mr. Roger D. Mellem
> c/o Mr. John Norton
> 1201 3rd Avenue, Suite 3400
> Seattle, WA 98101-3034
>
> Re:  Mr. John Norton
>      NDG Recovery Efforts
>
> Dear Mr. Norton,
>
> Due to irreconcilable conflicts of interest that have developed and our inability to resolve them, we have recognized that we cannot proceed as a group. The investor group that we represent cannot include Mr. Norton, Mr. Hadley, and Northland Capital, LLC or affiliated entities. We know that you are well represented and your attorneys may wish to file a suit that

parallels ours. We will be obtaining new counsel for our group. We trust that our respective groups and lawyers will cooperate to the extent possible to seek and maximize recoveries. We are returning your contribution in full; we are making no deduction for legal fees already incurred.

Norton and his attorneys did not cooperate with the Steering Committee or seek to obtain copies of the documents that NDG and Graham & Dunn produced to Sirianni. Instead, Norton pursued recovery of funds in Peru and filed a lawsuit in the United States against U.S. Bank, de Guzman, and NDG and a lawsuit against Prater.

Lawsuit against U.S. Bank, De Guzman, and NDG and Lawsuit against Prater

On October 14, 2010, Norton individually and derivatively on behalf of Larco-Bolivar LLC and Shell La Paz LLC; Northland individually and derivatively on behalf of NDG-Brycon LLC; and P.R.E. (collectively, Norton) filed a lawsuit against U.S. Bank, de Guzman, and NDG for breach of fiduciary duty and violation of the Washington State Securities Act (WSSA), chapter 21.20 RCW. Norton alleged de Guzman and NDG committed fraud, negligent misrepresentation, and breach of contract. Norton alleged claims against U.S. Bank for negligently hiring, retaining, or supervising employees; unjust enrichment; violation of the Washington Consumer Protection Act, chapter 19.86 RCW; and aiding and abetting fraud, breach of fiduciary duty, and conversion. During discovery, U.S. Bank subpoenaed records Sirianni had obtained on behalf of the Steering Committee.

In July 2011, the Unites States District Court Western District of Washington charged de Guzman with multiple counts of wire fraud and money laundering.

On August 15, 2011, Norton and Northland filed a lawsuit against Prater alleging fraud; negligent misrepresentation; violation of the WSSA; and aiding and abetting

fraud, breach of fiduciary duty, and conversion. After Prater filed for bankruptcy, the court stayed the lawsuit.

The Aggen Lawsuit against Graham & Dunn

On July 23, 2012, more than 80 NDG investors, many of whom were members of the Steering Committee, filed a lawsuit against Graham & Dunn, Angela Aggen, et al. v. Graham & Dunn, P.C., King County Superior Court Cause No. 12-2-25058-8 SEA (the Aggen Lawsuit).[3]

The complaint (the Aggen Complaint) alleged Graham & Dunn violated the WSSA, "which prohibits fraudulent or deceitful acts in connection with the offer, sale, or purchase of any security;" aided and abetted NDG in committing fraud and concealing misrepresentation; aided and abetted breach of fiduciary duty; and engaged in conspiracy to commit fraud and breach fiduciary duty.

The Aggen Complaint cites the NDG and Graham & Dunn websites in describing the relationship between Graham & Dunn and NDG.

> Because of its extensive work with NDG, Graham & Dunn was described on NDG's website as one of NDG's "Partners." The NDG website also indicated that Graham & Dunn "[p]rovides all NDG legal work in the US," and featured a photo of a Graham & Dunn attorney with De Guzman. NDG's sales personnel touted Graham & Dunn's reputation in soliciting investors, frequently telling investors that Graham & Dunn was NDG's corporate counsel with respect to its securities offerings.
> . . . Graham & Dunn touted its work for NDG on its website as well. The Graham & Dunn attorney in charge of the NDG relationship described his work for NDG as assisting "with respect to joint venture arrangements for the development and sale of various residential and mixed use condominium projects in Lima, Peru."[4]

---

[3] The complaint states that in February 2012, Graham & Dunn agreed to extend the statute of limitations to file the Aggen Lawsuit by approximately six months.

[4] Alteration in original.

The Complaint describes the January 23, 2009 meeting with Norton, Prater, Donaldson, and de Guzman at the office of Graham & Dunn when de Guzman admitted he used the funds from P.R.E. to purchase other property and the parties entered into the MOU.

### 1. The January 23, 2009 meeting at Graham & Dunn's offices.

108. In January 2009, certain investors (who were also investors in P.R.E., and who are not among the Plaintiffs in this case) became concerned about possible misdirection of funds by De Guzman. A meeting was held at the offices of Graham & Dunn on January 23, 2009 at which De Guzman was confronted by a representative of the P.R.E. investors and by De Guzman's own employees. With a Graham & Dunn attorney and paralegal in attendance, De Guzman admitted to fraud— specifically, paying funds belonging to Grau Residential, LLC to P.R.E. (purportedly to purchase the Grau property from P.R.E.), but then using those funds for unauthorized purposes. There was no confusion about what De Guzman was confessing. Graham & Dunn's timesheets for January 23, 2009 expressly acknowledge a "Meeting with Nino De Guzman . . . regarding mis-use of funds and related issues." At the conclusion of that meeting, Graham & Dunn prepared a memorandum of understanding on behalf of De Guzman, personally, that would remove De Guzman as a member of P.R.E., and would transfer certain NDG corporate authority from De Guzman to other NDG employees.

109. . . . None of the investors was told that their funds had been misused, or that NDG, De Guzman, and Graham & Dunn were negotiating to pay off the P.R.E. investors.

The Aggen Complaint alleged that following an internal investigation, NDG employees discovered de Guzman and Graham & Dunn "had caused Los Alamos Residential, LLC to pay more than $655,000.00 to P.R.E. for the purchase of a property that P.R.E. never owned and never conveyed to Los Alamos Residential, LLC."[5]

110. [T]he three NDG employees who had attended the January 23 meeting at Graham & Dunn's offices became seriously concerned about De Guzman's misuse of investor funds and took it upon themselves to conduct a confidential internal investigation of the use of NDG investor funds. Shortly thereafter, those employees ("the Whistleblowers")

_____

[5] Emphasis in original.

concluded that fraud had occurred, contacted state and federal authorities, and retained counsel.

111.    Among other things, the Whistleblowers discovered that De Guzman and Graham & Dunn had caused Los Alamos Residential, LLC to pay more than $655,000.00 to P.R.E. for the purchase of a property that P.R.E. never owned and never conveyed to Los Alamos Residential, LLC. Indeed, it was a Graham & Dunn attorney—acting well outside the role of an attorney performing routine professional services—who directed NDG's Director of Operations to wire those funds to P.R.E., despite the fact that the Los Alamos project had not yet been fully subscribed and there was no documentation to support the supposed purchase of the property. Those funds were never returned, and the investor/members of Los Alamos Residential, LLC were not told that the funds had been lost.[6]

The Aggen Complaint alleged that in addition to the LLC Agreements, NDG provided investors with a "Private Placement Memorandum" (PPM) describing the investment opportunity in the LLC, "the Peruvian real estate market[,] and the proposed building projects." The Complaint alleged the PPM stated that on advice of counsel, NDG planned to rely on the SEC exemption of "Section 4(2) and Rule 506 of Regulation D."

> NDG intended to rely upon an exemption from the registration requirements of the federal securities laws by complying with the provisions of Section 4(2) and Rule 506 of Regulation D adopted by the SEC thereunder. Indeed, on Graham & Dunn's advice, NDG specifically represented to investors that "NDG Investment Group offers and sells investments under exemptions from registration applicable to non-public offerings. No offer or solicitation will be made to any person except in full compliance with such exemptive provisions."

The Aggen Complaint alleged Graham & Dunn "knew that statement was false."

> Both NDG and Graham & Dunn were well aware that not one of NDG's offerings complied with the exemptive provisions of Regulation D. And yet, despite knowing that NDG was in continuous violation of the securities laws throughout 2008, Graham & Dunn continued to form new limited liability companies for NDG.[7]

---

[6] Emphasis in original.

[7] Emphasis in original.

The Aggen Complaint cites a number of attorney-client e-mails that were produced to Sirianni in July 2009 to allege that Graham & Dunn failed to comply with the SEC exemption. Specifically, that "Graham & Dunn was unable to file Form D with the SEC because NDG was not providing the firm with the required list of investors for each deal." Nonetheless, despite knowing NDG did not comply with the SEC exemption to file the Regulation D exemption, the Complaint alleged Graham & Dunn continued to form LLCs and "do new deals" for NDG throughout 2008.

The Aggen Complaint alleged Graham & Dunn later intentionally filed the Form D for the LLC projects on March 13, 2009 to take advantage of a change in the law and conceal the first date of sale. "[W]hen it made the state filing on March 13, Graham & Dunn purposely omitted the date of first sale in an attempt to conceal the fact that the forms were being filed late."[8] The Complaint alleged the "gambit—i.e., omitting the date of first sale from the state regulatory filing in the hope that DFI would not notice—failed almost immediately," and "[s]hortly after receiving the filing, DFI contacted Graham & Dunn requesting information regarding the date of first sale for the various deals." The Complaint alleged that when it became apparent that Graham & Dunn's involvement in "NDG's fraud throughout 2008 was about to come to light," the attorney e-mailed de Guzman on April 23 stating, " '[I]t remains absolutely critical that the ownership structure

_____

[8] The Complaint alleged:

Graham & Dunn filed Form D for the LLC Projects on March 13, 2009—more than 14 months late for the first transaction at issue (Arequipa, LLC) and more than two months late for the last transaction at issue (Jorge Chavez, LLC). By filing on the last possible day before the change in federal law was to take effect, Graham & Dunn succeeded in hiding the date of first sale from the SEC. However, the same was not true of the corresponding filing with the Washington State Department of Financial Institutions ("DFI"). The applicable Washington State regulation required disclosure of the date of first sale.

16

for each of your entities is duly evidence [sic] in your files and matches what was

disclosed in your private placement memorandum.' "[9]

The Aggen Complaint also quotes a portion of a November 14, 2008 e-mail from

Graham & Dunn to NDG that suggests NDG retain an employee to avoid disclosure of

the failure to comply with federal and state securities laws. As quoted in the Aggen

Complaint, the e-mail states:

> "As you know, **we continue to be in violation of various state and
> federal securities laws with respect to most of our deals** . . . Although
> my instincts tell me that [NDG Vice President for Business Development
> Nathan Hoerschelmann] will not take it upon himself to disclose NDG's
> failures to the authorities or to NDG's investors, this causes a great deal of
> concern. We will, of course, incorporate a confidentiality agreement within
> the separation agreement that is being drafted. Unfortunately, the
> confidentiality agreement will only be worth anything so long as it is
> honored — because, as soon **as the "cat's out of the bag"**, our ability to
> enforce this agreement really doesn't help us much. Because **this would
> be a HUGE issue for you if these violations were publicly known,** you
> may want to consider whether it makes sense to maintain Nathan's
> employment until the violations can be remedied."[10]

Norton Lawsuit against Graham & Dunn

On April 11, 2013, John and Kristine Norton, individually and derivatively on

behalf of Larco-Bolivar Investment LLC and Shell La Paz LLC; Northland Capital LLC,

individually and derivatively on behalf of NDG-Brycon LLC; and P.R.E. Acquisitions LLC

(collectively, Norton) filed a lawsuit against Graham & Dunn, King County Superior

Court Cause No. 13-2-16205-9 SEA. The lawsuit asserted the same claims against

Graham & Dunn as in the Aggen Complaint—violation of the WSSA; aiding and abetting

NDG and de Guzman in committing fraud, misrepresentation, and breach of fiduciary

---

[9] Alterations in original.

[10] Some alteration in original, boldface in original.

duty; engaging in a conspiracy to commit fraud; negligent misrepresentation; breach of fiduciary duty; and professional negligence.

The Norton complaint alleged Graham & Dunn facilitated the "Ponzi scheme" by forming the LLCs for NDG in 2007 and 2008, breached its duty to "prepare and timely file Form D" with the SEC," and filed "falsified Form Ds."

> Graham & Dunn knew and repeatedly confirmed to NDG that it was aware of the failure of NDG and Graham & Dunn to file Form Ds for the NDG LLCs, including the LLCs in which the Nortons invested: Larco-Bolivar, Shell La Paz, and NDG-Brycon.
>      . . . Graham & Dunn's omissions, made knowingly and intentionally by Graham & Dunn, were material violations of the securities laws. If Graham & Dunn had insisted on filing a Form D for any of the Peru Investment Companies it formed, investors like the Nortons and Northland would have known that the Peru Investment Companies were all woefully undersubscribed and thus incapable of funding the developments NDG promised they would complete.
>      . . . .
>      . . . In March 2009, . . . in a desperate attempt to assist Nino de Guzman, Graham & Dunn furiously filed the missing Form Ds for the Plaintiff Companies. . . . Graham & Dunn filed falsified Form Ds <u>one day</u> before a change in federal law look place. This change required Form Ds to be filed electronically on March 13, 2009 and thereafter. The electronic filing would require disclosure of the date of the first sale for each transaction, something Graham & Dunn and Nino de Guzman wanted desperately to avoid. Graham & Dunn filed the Form Ds on March 12, 2009 in paper form and did not disclose the date of the first sale of each investment.
>      . . . Graham & Dunn never filed a Form D for NDG-Brycon. In its required Washington state filings, Graham & Dunn also omitted the date for the first sale of investments in NDG-Brycon, which caused the Washington State Department of Financial Institutions to contact Graham & Dunn and demand that Graham & Dunn file the appropriate information.[11]

Norton alleged he was "wholly unaware of the underlying facts of this lawsuit until July 2012" when the <u>Aggen</u> Complaint was filed.

> In the July 2012 lawsuits, the plaintiffs explain in depth Graham & Dunn's role in Nino de Guzman's schemes. It was only then that Plaintiffs

---

[11] Emphasis in original.

18

discovered the depths of Graham & Dunn's participation in the NDG and Nino de Guzman schemes. . . . [S]ome of the NDG employees presumably had constant communication with Graham & Dunn, but they were not fully aware of the collusion between Graham & Dunn and Nino de Guzman. Simply put, Graham & Dunn very effectively concealed its role in the NDG scheme.

Graham & Dunn asserted as an affirmative defense that the three-year statute of limitations barred the claims.[12]

Aggen Lawsuit Summary Judgment Order

On March 12, 2014, Graham & Dunn filed a motion for summary judgment dismissal of the claims alleged in the Aggen Lawsuit. On July 3, 2014, the court entered a 27-page "Order Granting In Part and Denying In Part Defendant's Motion for Summary Judgment." The court dismissed the negligence and legal malpractice claim because the LLC Agreements make clear Graham & Dunn is not acting as the attorney for the investors. The court also dismissed the conspiracy and aiding and abetting breach of fiduciary duty claims.

The court denied summary judgment dismissal of the claim against Graham & Dunn alleging conspiracy to commit fraud or aiding and abetting fraud. The court denied summary judgment dismissal of claims under the WSSA because there were genuine issues of material fact about whether Graham & Dunn is a "seller."

A reasonable jury could find that the law firm provided business advice on what rates of return to offer to investors to maximize NDG's profits; drafted offering memoranda with the representation that the offering was exempt from registration while knowing of NDG activities that could jeopardize that exemption; drafted the LLC agreements and subscription agreements reaffirming the existence of the exemption; . . . advised NDG to pay Northland money raised from investors in the Los Alamos project after de Guzman admitted to misusing monies received from Northland; and

_____

[12] In November 2013, de Guzman pleaded guilty to the federal charges of wire fraud and money laundering. At his sentencing on December 5, 2013, the court imposed "Special Conditions of Supervision" including restitution in the amount of $18,321,209.07 "due immediately."

advised NDG employees to continue to solicit investors for the Los Alamos project to replenish the funds paid out to Northland. A reasonable jury could also find that Graham & Dunn's role was as significant as the role played by de Guzman or other NDG employees because the law firm drove the pace of the new LLCs offerings with full knowledge that NDG was in violation of securities laws on earlier offerings and by advising NDG employees to hide these violations from investors, the SEC and the DFI. This evidence, when viewed in the light most favorable to Plaintiffs, creates a genuine issue of material fact as to whether Graham & Dunn's actions were a substantial contributive factor in NDG's securities sales.

The court specifically addressed the dispute about whether the failure to file Form Ds was "a material fact that should have been disclosed by NDG to investors," and concluded the "failure to file Form Ds on earlier LLC offerings was a material fact."

> The parties dispute whether NDG's failure to file Form Ds was a material fact that should have been disclosed by NDG to investors. Graham & Dunn correctly notes that under federal law, the failure to file a Form D does not automatically lead to the loss of the federal registration exemption. . . .
>
> The Graham & Dunn securities lawyer, Bart Bartholdt, testified that he has never allowed a client to sell securities without complying with the Regulation D time limit. Drader advised NDG that having to disclose the securities violations could lead the DFI to require NDG to return investors' money to them. Drader also allegedly advised NDG employees to hide the securities law violations from the authorities and investors. This evidence could convince a reasonable jury that NDG's failure to file Form Ds on earlier LLC offerings was a material fact that could have affected investor's decisions to buy, sell or hold the securities.

But the court notes Graham & Dunn presented compelling evidence that de Guzman "duped everyone."

> Ultimately, a fact-finder may not find Plaintiffs' witnesses credible. Graham & Dunn has presented compelling evidence that de Guzman was so charismatic and his Ponzi scheme so sophisticated that he duped everyone, including the Graham & Dunn attorneys. The jury may also find that NDG's failure to file the Form Ds and the theoretical loss of a securities registration exemption were not, in fact, significant risks and the disclosure of these facts would have had no impact on the Plaintiffs' decision to buy into the Peruvian LLCs. But this Court cannot make that credibility call on summary judgment.

In a separate order, the court granted Graham & Dunn's motion to dismiss "all claims of Plaintiffs Clarus Investment 9, LLC and Clarus Investment 10, LLC" in the Aggen Lawsuit as barred by the statute of limitations. The court ruled the three-year statute of limitations governed the "state securities claims, the aiding and abetting claims and the conspiracy claims," and the Clarus plaintiffs "knew or should have known of a possible claim against Defendant Graham & Dunn by October 2008."

In September 2014, shortly before the scheduled trial, the Aggen plaintiffs reached an agreement with Graham & Dunn to settle their claims.

Graham & Dunn Motion for Summary Judgment Dismissal in Norton Lawsuit

On October 9, 2014, Graham & Dunn filed a motion for summary judgment dismissal of Norton's lawsuit as barred by the three-year statute of limitations. Graham & Dunn asserted the three-year statute of limitations governed the claims alleged in the April 11, 2013 lawsuit.

Graham & Dunn argued the evidence established Norton invested significant funds in NDG real estate projects; in March 2009, Norton knew de Guzman was engaged in a Ponzi scheme; in a June 2009 e-mail to the Steering Committee, Norton identified claims for recovery against Graham & Dunn as well as U.S. Bank; and Norton had access to the information produced to Sirianni.

Graham & Dunn submitted more than 35 exhibits in support of the motion for summary judgment including the March 11, 2009 e-mail from Prater to Norton stating de

Guzman defrauded investors;[13] e-mails from Norton to the Steering Committee; e-mails showing that in July 2009, the Steering Committee attorney obtained copies of NDG and Graham & Dunn documents including e-mails, correspondence, memoranda, billing records, and attorney notes; excerpts from Norton's deposition; and the September 9, 2009 letter from the Steering Committee to Norton offering to cooperate with Norton. Graham & Dunn also submitted the complaint Norton filed against U.S. Bank, de Guzman, and NDG; the complaint against Prater; and pleadings showing Norton later recovered $6 million from an arbitration award he obtained in Peru and $750,000 from property sold in Peru.

In opposition, Norton submitted a declaration, excerpts from his deposition, and pleadings from the summary judgment motion in the Aggen Lawsuit.

In his declaration, Norton admits identifying Graham & Dunn as a potential defendant in a June 2009 e-mail to the Steering Committee.

> I included Graham & Dunn in an email to the Steering Committee listing all potential defendants, and in my statement explaining my role with NDG, Northland, and P.R.E. to the Peruvian authorities (see Peterson Declaration Ex. 37), only because there was a possibility that we might discover the lawyers, and anyone else who conducted business with Nino de Guzman, had participated in and assisted with Nino de Guzman's actions.

Norton admits he knew the Steering Committee attorney Sirianni "received some documents from Graham & Dunn," but states he "never saw the documents sent to Sirianni." After leaving the Steering Committee in September 2009, he and his legal

---

[13] The March 11, 2009 e-mail states, in pertinent part:

[Fulton] has confirmed that [de Guzman] has admitted to have been running a financial house of cards. . . . [De Guzman] has used [investor] funds in a variety of ways. These have ranged from financing his personal extravagant lifestyle to repaying investors in previous deals. Very sad and I wish it was not true. The number of disclosures from [de Guzman] keep growing and none are good. He has proven himself to be a very accomplished liar and con man.

team pursued the recovery of assets in Peru and filed lawsuits in the United States against U.S. Bank, de Guzman, NDG, and Prater.

> I continued to focus on the recovery of potential assets in Peru and entered into negotiations directly with Grupo Innova as a creditor via my legal teams in Seattle and Lima. I also sued Nino de Guzman and U.S. Bank, Nino de Guzman's former employer, because it allowed, perpetuated, and profited from Nino de Guzman's laundering of investor funds and transfers of massive amounts of investor money to his own personal accounts. I also sued Prater for his breaches of his duties to me as my financial advisor.

Norton argued the fraud and WSSA violation claims against Graham & Dunn did not accrue until the Aggen Complaint was filed on July 23, 2012. Norton asserted Graham & Dunn did not show he had access to documents implicating Graham & Dunn before the Aggen Complaint was filed in July 2012. Norton claimed he did not know Graham & Dunn "was an active and willing participant" in the fraud or violated the WSSA until the plaintiffs filed the Aggen Complaint on July 23, 2012. Norton argued he did not discover evidence of Graham & Dunn's role until the Aggen Complaint disclosed the contents of the November 14, 2008 e-mail between Graham & Dunn attorney Drader and de Guzman.

In reply, Graham & Dunn argued there was no evidence Norton exercised due diligence in obtaining information that formed the basis for the allegations in the Aggen Complaint including the documents produced to Sirianni and the Steering Committee. Graham & Dunn asserted the allegations in the Aggen Complaint also showed Norton could have obtained the same information from NDG employees and the NDG and Graham & Dunn files, including the November 14, 2008 e-mail that was "later

23

discovered in NDG's files."

> For example, Plaintiffs offer no evidence that they sought to obtain the information gathered by their lawyers, the Sirianni firm. Plaintiffs offer no evidence that they sought to obtain information from the Steering Committee investors, despite knowing that those investors were gathering evidence to pursue claims against [Graham & Dunn]. Plaintiffs offer no evidence that they sought to obtain information from NDG or its employees Glenn Fulton, Darin Donaldson, and Phil Boos. And yet Plaintiffs sued every other potential defendant listed in Norton's June 11, 2009 email within three years.[14]

In support, Graham & Dunn identified the allegations in the Aggen Complaint that explicitly rely on documents produced to Sirianni in July 2009. The declaration comparing the Aggen Complaint allegations and the documents produced to Sirianni states, in pertinent part:

EXHIBIT 1    Email dated January 24, 2008 quoted in paragraph 100 (first bullet point) of the Complaint for Damages dated June 22, 2012 filed in Aggen, et al. v Graham & Dunn, P.C., King County Superior Court No. 12-2-25058-8 SEA [(the Aggen Lawsuit)].

EXHIBIT 2    Email dated January 28, 2008 quoted in paragraph 100 (second bullet point) of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 3    Email dated April 1, 2008 quoted in paragraph 100 (third bullet point) of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 4    Email dated May 21, 2008 quoted in paragraph 100 (fourth bullet point) of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 5    Email dated July 16, 2008 quoted in paragraph 100 (fifth bullet point) of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 6    Email dated February 9, 2009 attaching the voicemail quoted in paragraph 114 of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

---

[14] Footnote omitted.

24

EXHIBIT 7    A true and correct copy of the transcript of the voicemail dated February 9, 2009 quoted in paragraph 114 of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 8    Email dated March 3, 2009 quoted in paragraph 117 of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 9    Email dated March 10, 2009 quoted in paragraph 119 of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

EXHIBIT 10   Email dated April 23, 2009 quoted in paragraph 127 of the Complaint for Damages dated June 22, 2012 filed in [the Aggen Lawsuit].

The court granted the motion to dismiss Norton's lawsuit with prejudice.

Norton Lawsuit Summary Judgment Order

The court ruled Norton's claims were barred by the statute of limitations. The court concluded Norton knew about the Ponzi scheme in March 2009, knew Graham & Dunn represented de Guzman and formed the LLCs, and identified Graham & Dunn by June 2009 "as a possible source of recovery" and did not act with due diligence to pursue his claims against Graham & Dunn. The "Order Granting Defendant's Motion for Summary Judgment" states, in pertinent part:

> [T]he Norton Plaintiffs knew of de Guzman's Ponzi scheme by March 2009, at the latest. They knew that Graham & Dunn had represented de Guzman, the LLCs in which they had invested, and PRE by that date as well. The Norton Plaintiffs immediately began investigating avenues for recovering losses, and by June 2009 they had identified Graham & Dunn as a possible source of recovery. They joined the investor steering committee and contributed money to retain counsel to assist in recovery efforts against Graham & Dunn. By mid-July 2009, the steering committee's attorney had received a copy of Graham & Dunn files, including most of the emails between Nick Drader and de Guzman that formed the basis for securities and fraud claims alleged in the Aggen complaint. Based on the record before this Court, the Norton Plaintiffs

25

had a significant amount of information about Graham & Dunn's activities and ample time to analyze this information by at least September 2009, which was when the steering committee and the Norton Plaintiffs chose to go their separate ways.

The court concluded that by September 2009, Norton knew or should have known the facts to support a claim against Graham & Dunn for aiding and abetting fraud and violation of the WSSA. The court concluded the November 14, 2008 e-mail from Drader to de Guzman "may have provided additional support," but the record established Norton had "ample evidence on which to base a claim under the WSSA before July 2012" and "a significant amount of information about Graham & Dunn's activities and ample time to analyze this information by at least September 2009."

> The Court concludes that while this email may have provided additional support for a securities fraud or aiding and abetting fraud claim, the Norton Plaintiffs had ample evidence on which to base a claim under the WSSA before July 2012. . . . Most of this evidence was available to the Norton Plaintiffs by September 2009. Indeed, the facts the Norton Plaintiffs alleged in Paragraphs 30-40, 42-43, and 47-48, of their complaint were based on information Graham & Dunn had produced or information that was publicly available by July 2009.

The court also notes that Norton "provided the Court with no explanation for why, through reasonable investigation, [he was] unable to access the November 2008 email on which [he relies]."

For the first time in his motion for reconsideration, Norton argued the court should equitably toll the statute of limitations. The court denied the motion for reconsideration.

Norton appeals summary judgment dismissal of the lawsuit against Graham & Dunn and denial of the motion for reconsideration.

26

Appeal of Summary Judgment Dismissal of the WSSA and Aiding and Abetting Fraud
Claims

Norton contends the court erred in granting summary judgment dismissal of his
claims for violation of the WSSA and aiding and abetting fraud. Norton does not dispute
and we agree the three-year statute of limitations applies to these claims against
Graham & Dunn. See RCW 21.20.430(4)(b) (securities fraud); RCW 4.16.080(4)
(aiding and abetting fraud).[15] Norton contends there are material issues of fact as to
whether he knew or should have known the facts to support the claims against Graham
& Dunn for violation of the WSSA and aiding and abetting fraud. Norton argues he did
not learn the extent of Graham & Dunn's involvement in the scheme until the plaintiffs
filed the Aggen Complaint quoting the November 14, 2008 e-mail.

We review a summary judgment order de novo, engaging in the same inquiry as
the trial court. Neighborhood All. of Spokane County v. Spokane County, 172 Wn.2d
702, 715, 261 P.3d 119 (2011). We view all facts and reasonable inferences in the light
most favorable to the nonmoving party. Fulton v. Dep't of Soc. & Health Servs., 169
Wn. App. 137, 147, 279 P.3d 500 (2012).

A defendant moving for summary judgment has the initial burden to show the
absence of any genuine issue of material fact. Young v. Key Pharm., Inc., 112 Wn.2d
216, 225, 770 P.2d 182 (1989). If the defendant meets this initial showing, the burden
shifts to the plaintiff to set forth specific evidence establishing a genuine issue of
material fact. Young, 112 Wn.2d at 225 (citing Celotex Corp. v. Catrett, 477 U.S. 317,
325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

---

[15] Norton also does not dispute the three-year statute of limitations governs breach of fiduciary
duty and professional malpractice, RCW 4.16.080(2); and conspiracy and negligent misrepresentation,
RCW 4.16.080(4).

The plaintiff cannot meet its burden by relying on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004) (citing CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988)). While we construe all evidence and reasonable inferences in the light most favorable to the nonmoving party, if the plaintiff fails to make a showing sufficient to establish the existence of a material issue of fact, summary judgment is proper. Young, 112 Wn.2d at 225.

The discovery rule operates to prevent the commencement of the running of the statutory period until the time the claimant knows or should have known the facts giving rise to his claim. Reichelt v. Johns-Manville Corp., 107 Wn.2d 761, 769, 733 P.2d 530 (1987). "A cause of action will accrue on that date even if actual discovery did not occur until later." Allen v. State, 118 Wn.2d 753, 758, 826 P.2d 200 (1992).[16] The discovery rule does not require knowledge of the existence of a legal cause of action or "smoking gun" proof of the essential facts. Reichelt, 107 Wn.2d at 769; Beard v. King County, 76 Wn. App. 863, 868, 889 P.2d 501 (1995).

The discovery rule delays the start of the statute of limitations period "only until the time when a plaintiff, through the exercise of due diligence, should have discovered the basis for the cause of action." Allen, 118 Wn.2d at 758. Here, the statute of limitations began when Norton discovered or should have discovered through the exercise of due diligence the facts of the fraud or securities fraud and sustained actual damage as a result. Ives v. Ramsden, 142 Wn. App. 369, 384-85, 174 P.3d 1231 (2008); Allen, 118 Wn.2d at 758; Reichelt, 107 Wn.2d at 772.

---

[16] Emphasis in original.

"An injured claimant who reasonably suspects that a specific wrongful act has occurred is on notice that legal action must be taken." Beard, 76 Wn. App. at 868. " '[W]hen a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm.' " Clare v. Saberhagen Holdings, Inc., 129 Wn. App. 599, 603, 123 P.3d 465 (2005) (quoting Green v. A.P.C., 136 Wn.2d 87, 96, 960 P.2d 912 (1998)); Allen, 118 Wn.2d at 758. " '[O]ne who has notice of facts sufficient to put him upon inquiry is deemed to have notice of all acts which reasonable inquiry would disclose.' " Clare, 129 Wn. App. at 603[17] (quoting Green, 136 Wn.2d at 96); see also Hawkes v. Hoffman, 56 Wash. 120, 126, 105 P. 156 (1909).

The plaintiff bears the burden of proof that facts constituting the claim were not and could not have been discovered by due diligence within the applicable limitations period. Clare, 129 Wn. App. at 603. In applying the discovery rule, we use an objective standard and consider when a reasonable person in Norton's position exercising due diligence would have discovered the facts of violation of the WSSA and aiding and abetting securities fraud. See In re Estates of Hibbard, 60 Wn. App. 252, 259, 803 P.2d 1312 (1991). When the plaintiff should have discovered the wrongful act is ordinarily a question for the trier of fact. Ruff v. County of King, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). However, where reasonable minds can reach but one conclusion, application of the discovery rule may be determined as a matter of law. Ruff, 125 Wn.2d at 703-04.

Norton filed his lawsuit against Graham & Dunn in April 2013. Reasonable minds can only conclude that by at least September 2009, Norton knew or through the

---

[17] Alteration in original.

exercise of due diligence should have known the facts to support a claim against Graham & Dunn for violation of the WSSA and aiding and abetting fraud.

Norton knew Graham & Dunn drafted the LLC Agreements for the NDG real estate projects. There is no dispute that in late January 2009, de Guzman admitted he misused P.R.E. funds. Graham & Dunn drafted the MOU between Norton, Prater, and de Guzman in January 2009. Norton was represented by his attorneys at Ryan Swanson & Cleveland.[18]

There is no dispute Prater informed Norton in a March 11, 2009 e-mail that de Guzman was engaged in a Ponzi scheme. The e-mail states, in pertinent part:

> [Fulton] has confirmed that [de Guzman] has admitted to have been running a financial house of cards. . . . [De Guzman] has used [investor] funds in a variety of ways. These have ranged from financing his personal extravagant lifestyle to repaying investors in previous deals. Very sad and I wish it was not true. The number of disclosures from [de Guzman] keep

---

[18] On January 23, 2009, Norton sent an e-mail concerning the need for additional provisions for the MOU.

> Add clause to require [de Guzman] to transfer all financial authority to [Fulton] and [Donaldson] and remove his signing authority from all bank and trust accounts, as we discussed today. Also get written confirmation from all financial institutions and lawyers when this is accomplished, as appropriate.
>
> Add acceptance of and cooperation with any Northland, Prater and/or Norton auditors (attorneys, accountants, etc.) either on a drop-in or ongoing basis by [Peruvian attorney] Rebaza, [PricewaterhouseCoopers], Graham & Dunn, etc. Full disclosure / transparency required.
>
> In conjunction with item #2, [de Guzman] to provide a current detailed financial statement listing all personal & financial assets and real property by January 31, 2009 sufficient to file a lien on his holdings, if and when required. [De Guzman] should disclose any and all claims on his assets and an affidavit he will not dispose of any asset until this matter is dealt with.
>
> Add requirement for NDG representative (not [de Guzman]) to provide specified written status reports (email) on any and all action plans, specifically Exhibit A [Liquidation Plan], every other day. Any change in the Liquidation Plan should require written notice and concurrence prior to implementation.
>
> . . . .
>
> I spoke with Jay Hadley this pm and he is expecting Glenn[ Fulton]'s call.

30

growing and none are good. He has proven himself to be a very accomplished liar and con man.

The record shows that after entering into the MOU and receiving the March 11, 2009 e-mail from Prater, Norton and his attorneys "continued to review Information obtained through cooperation with officers of NDG." Norton testified that he and his attorneys "continued to discover, over an extended period of time, the inappropriate nature of Mr. de Guzman's business dealings in both the U.S. and Peru."

After joining the Steering Committee, Norton sent an e-mail in June 2009 that identifies claims against Graham & Dunn and U.S. Bank.

> The monies already returned to the US have to be claimed against the US defendants and Innova should be held accountable for the money they retained and used. In turn the "Innova" monies returned from Peru to the US should be added to the US claim against [de Guzman]/NDG/[Graham & Dunn] and US Bank, as those funds were mishandled/misused "after" they returned to the US.[19]

In a statement Norton prepared in August 2010, he describes his participation in the Steering Committee and states the Steering Committee "investigation and recovery effort" focused primarily on U.S. Bank and Graham & Dunn.

> I had originally invested in a U.S. recovery investor fund that was put together by the Steering Committee to finance an investigation and recovery effort, primarily focused on the responsibility of U.S. Bank and NDG's attorneys Graham & Dunn, a law firm in Seattle.[20]

---

[19] Emphasis added.

[20] In his declaration in opposition to summary judgment, Norton explains:

I included Graham & Dunn in an email to the Steering Committee listing all potential defendants, and in my statement explaining my role with NDG, Northland, and P.R.E. to the Peruvian authorities . . . only because there was a possibility that we might discover the lawyers, and anyone else who conducted business with Nino de Guzman, had participated in and assisted with Nino de Guzman's actions.

31

There is no dispute that in July 2009, the attorney representing the Steering Committee obtained documents including e-mails between NDG and Graham & Dunn that show Graham & Dunn did not comply with the securities law exemption and the requirement to file a Form D throughout 2008.

Under state and federal securities law, the seller must file a Form D within 15 days of the first sale of a security. 17 C.F.R. § 230.503(a)(1); WAC 460-44A-503(1). The record shows securities forms are public documents and the DFI database allows "the public . . . to determine whether or not any filings have been made on behalf of an issuer."

The e-mails show that despite knowing NDG was not in compliance with securities regulations during 2008 and into 2009 and knowing there were accounting discrepancies, Graham & Dunn continued to form additional LLCs for NDG.

For example, in a May 21, 2008 e-mail from Graham & Dunn attorney Drader to NDG Vice President Nathan Hoerschelmann, Drader states NDG is "in violation of your obligations under the securities laws."

> Again, it is critical we get these [membership] rosters and signature pages in a timely manner, but I don't believe we have received hardly any of them back.
>
> 504, 505 and 506 are the Sections of Regulation D under which certain parties are able to claim an exemption from "registration". We are typically exempt under 506. Notwithstanding the exemption from "registration" we are still required to file a Form D in each of our offerings with both the SEC and each of the States in which we sell securities — and this Form D is required to be filed within 15 days of the day you first accept money. Due to lack of receipt of info from NDG, however, Graham & Dunn has not been able to make these filings. Thus, you are in violation of your obligations under the securities laws.

In a July 16, 2008 e-mail to de Guzman, Graham & Dunn attorney Drader reiterates the failure to comply with "Blue Sky filings" is "a major issue."

> As you know, your Blue Sky filings are not being processed in a timely manner because NDG has not been timely providing us the list of the members in order to get the filings processed. These filings need to be made within 10 days of the day you first receive any money but very few have been made at all due to our lack of info. Sorry to be so blunt, but as I've said before, this is a major issue.

In a transcribed February 9, 2009 voicemail message from NDG Director of Operations Donaldson to Graham & Dunn attorney Drader, Donaldson says he is "concerned . . . the numbers aren't adding up" and it "looks like [de Guzman] may have taken more money than we were supposed to for NDG-Brycon."

> Hey Nick [Drader], Darin Donaldson here . . . . I wanted to let you know I sent you an email with regards to the documentation I truly do have, uhm, for NDG-Brycon. . . . I have yet to hear or get any confirmation on the true membership roster for NDG-Brycon, LLC since that, uh, was an entity that only [de Guzman] had involvement on. Uhm, just so you know, I did not include [de Guzman] on my last response because I was addressing concerns, uhm, regarding the lack of, uh, communication that I have from him. I did not want to kind of throw him under the bus with you . . . but, uh, I'm just, uhm, a little concerned regarding this stuff and the fact that I'm thrown in the middle of all of this when I really had no involvement on the initial fundraising or documenting of, of NDG-Brycon. Uhm I'm, I'm only a scribe in this and I truly want there to be a record of that because, uh, I'm not sure what's going on here, but the numbers aren't adding up. It looks like [de Guzman] may have taken more money than we were supposed to for NDG-Brycon, or uhm, maybe I just have documentation that, uhm, doesn't accurately reflect the dollar amounts invested.

The documents show Drader was aware that there was a $1.85 million shortfall for the Arequipa LLC that involved "a Peruvian developer that is not part of the

Arequipa, LLC." In a March 3, 2009 e-mail to NDG employee Fulton, Drader states that the $1.85 million was provided by a Peruvian developer.

> [De Guzman] confirmed on the phone that the [accounting] is correct. The $1.85MM gap was provided by a Peruvian developer that is not part of the Arequipa, LLC. Instead, they are getting development fees out of the deal as a third party contractor. Per [de Guzman], this has been documented in a Peruvian contract.

The April 23, 2009 e-mail from Graham & Dunn to Fulton, Donaldson, and de Guzman states DFI requested Graham & Dunn "provide them with the date of first sale and a Uniform Consent to Service of Process in connection with the Reg D filings filed in Washington." Graham & Dunn asked Fulton to "sign each consent" on behalf of NDG.

> We have been requested by the Department of Financial institutions to provide them with the date of first sale and a Uniform Consent to Service of Process in connection with the Reg D filings filed in Washington. In connection therewith, we prepared a Uniform Consent to Service of Process ("Form U-2") for each of the following entities:
>
> Shell La Paz LLC
> Los Alamos Residential, LLC
> Grau Residential, LLC
> El Golf Residential, LLC
> Jorge Chavez, LLC
> Arequipa, LLC
> Del Solar Residential, LLC
> NDG-Brycon, LLC
> NDG-Brycon2, LLC
> Ejercito Residential, LLC
> Larco-Bolivar Investment, LLC
> Residencial Casuarinas, LLC
>
> Please sign each consent on behalf of NDG Investment Group L.L.C., as Executive Vice President - Peru Projects, and return the originals to us at your earliest convenience.

In another e-mail dated April 23, 2009 from Drader to de Guzman and Fulton, Drader states NDG "significantly missed the filing deadlines" for the LLCs.

NDG significantly missed the filing deadlines for each of the below filings. As a reminder, Graham & Dunn had repeatedly advised that the Form D filings had to be done within 15 days of the date that you first accepted money for each of these transactions.

. . . .

Shell La Paz LLC
Los Alamos Residential, LLC
Grau Residential, LLC
El Golf Residential, LLC
Jorge Chavez, LLC
Arequipa, LLC
Del Solar Residential, LLC
NDG-Brycon, LLC
NDG-Brycon2, LLC
Ejercito Residential, LLC
Larco-Bolivar Investment, LLC
Residencial Casuarinas, LLC.

Drader advises de Guzman and Fulton that the State "may require NDG to go back to each of your investors on the below transactions and offer to rescind the offering (i.e. refund their money)," but suggests "a wait-and-see approach."

At this point, we are almost certain the State of Washington (Dept of Financial institutions) will come back with a response as to how NDG might be penalized for this. As one of the "worst case scenario" possibilities, the State may require NDG to go back to each of your investors on the below transactions and offer to rescind the offering (i.e. refund their money). As I'm sure you don't currently have the capital to do that, we would need to try to negotiate with the State for an alternative resolution. However, rather than focus on the worst-case scenario, we should probably take a wait-and-see approach to see how the state will respond.[21]

Drader then states, "In the meantime, it remains absolutely critical that the ownership structure for each of your entities is duly evidence in your files and matches what was disclosed in your private placement memorandum."

---

[21] Emphasis in original.

In an April 27, 2009 e-mail from Fulton's attorney at Lane Powell to Drader, the attorney seeks clarification about the steps taken to comply with the SEC exemption.

> We are in receipt of an email dated April 23, 2009 from . . . your office, to Glenn Fulton, with copies to Jose Nino de Guzman, Darin Donaldson and yourself. . . .
>
> Prior to counseling our client regarding [Graham & Dunn]'s request, we want to be sure that we understand your position on these items. Please advise whether it is your counsel to NDG that it must provide this information to state regulators at this time. Please also advise as to whether similar information was provided to state regulators at the time of the consummation of securities offerings for the LLCs. In our experience, the Form U-2 is most commonly provided to state regulators at the time of filing a Form D. Was the Form D filed with respect to securities offerings by the LLCs within the 15-day period required under state law? If not, when was it filed? Also, please advise as to why the Form U-2 was not filed at the time of the initial Form D filing.

In response, Drader concedes the Form Ds did not "disclos[e] the date when securities were first sold." The April 27, 2009 e-mail from Drader to the attorney at Lane Powell states, in pertinent part:

> NDG was aware that they were required to file a Form D for each private placement within 15 days of the first sale of securities, but they did not meet the deadline. The information required for filing the various Form Ds was received by Graham & Dunn in February / March of 2009, and the Form Ds / U-2s were filed at that time without disclosing the date when securities were first sold.

In a May 12, 2009 e-mail to Drader, the Lane Powell attorney states the NDG employees will not comply with the request to submit a Form U-2.

> We represent Glenn Fulton, Darin Donaldson and Phil Boos. We have received a copy of your request to Mr. Fulton that he execute Forms U-2 Consent to Service of Process, provide dates of the first sales of securities in connection with certain prior securities offerings, and provide information regarding an outstanding subscription agreement for an offering by NDG-Brycon, LLC.
>
> Given the substantial uncertainty which now exists regarding the status of prior private placements of securities in NDG-sponsored offerings, please

be advised that our client is not currently in a position to comply with your request. Should you feel that a response to the Washington Department of Financial Institutions is appropriate, we recommend that you obtain any necessary authorizations or signatures from Mr. Jose Nino de Guzman.

The first time Graham & Dunn filed Form D for the NDG LLCs was on March 31, 2009, more than 14 months after forming Arequipa LLC and more than 2 months after forming the last LLC, Jorge Chavez LLC. The documents produced to Sirianni and the Steering Committee show the attempt of Graham & Dunn to exploit a loophole in federal law in March 2009 that would have allowed de Guzman to hide violations of securities laws. When NDG Vice President Fulton asks Drader for an extension on revising the LLC Agreement for Arequipa LLC "because there are quite a few mistakes for folks to digest here and several new contracts to execute," Drader responds it is "not possible to extend . . . . The date is due to federal legislation."

Although Norton identified claims against Graham & Dunn in June 2009 and in September 2009, the Steering Committee expressly offered to cooperate with Norton and his attorneys in pursuing litigation. Norton never made any effort to obtain the documents from the Steering Committee or pursue claims against Graham & Dunn. Instead, Norton and his legal team successfully pursued recovery efforts in Peru, and in the United States, Norton filed a lawsuit against U.S. Bank, de Guzman, and NDG in 2010 and filed a lawsuit against Prater in 2011.

Nonetheless, Norton argues that because there is no evidence he "saw the documents sent to Sirianni," he had no reason to believe Graham & Dunn violated the WSSA or aided and abetted the Ponzi scheme.

> I never saw the documents sent to Sirianni, and never had direct communication with him outside the initial interview. I have never heard from any source that Sirianni's investigation uncovered information which

would have altered my impression at the time that Graham & Dunn were acting appropriately to correct Nino de Guzman's mismanagement. I had no reason to believe Sirianni had any knowledge regarding Graham & Dunn's wrongdoing, and no such wrongdoing was conveyed to me from Sirianni.

Contrary to Norton's assertion that the discovery rule tolls the statute of limitations because he did not actually see the documents produced to Sirianni, the discovery rule requires him to use due diligence to discover the basis for his cause of action. Reichelt, 107 Wn.2d at 772. A cause of action accrues when a plaintiff, through the exercise of due diligence, knows or should have known the relevant facts. Allen, 118 Wn.2d at 758. The undisputed record shows Norton knew in March 2009 that he had lost more than $9 million in a Ponzi scheme and in June 2009, Norton identified claims against Graham & Dunn.

Next, Norton claims he did not discover Graham & Dunn violated the WSSA or aided and abetted the Ponzi scheme until the plaintiffs filed the Aggen Complaint in July 2012. Norton relies heavily on the excerpts from a November 14, 2008 e-mail quoted in the Aggen Complaint to argue there is a genuine issue of material fact as to whether he knew or should have known the factual basis for the WSSA and aiding and abetting fraud claims against Graham & Dunn. Norton asserts the e-mail was "the piece of evidence that demonstrated Graham & Dunn's active participation in the Ponzi scheme and its cover up."[22] We agree with the trial court that while the Graham & Dunn e-mail provides additional evidence, the undisputed record establishes Norton knew or through the exercise of due diligence should have known facts to support claims against

---

[22] (Emphasis in original.) Norton did not submit a copy of the November 2008 e-mail. Graham & Dunn contends the record shows "[a] number of other emails between Graham & Dunn and NDG relating to the late Form D filings—including the November 14, 2008 email Norton makes so much of—were in the NDG employees' computer hard drives preserved by Blank Law + Tech."

Graham & Dunn for violation of the WSSA and aiding and abetting fraud by September 2009. The record shows that instead of pursuing claims against Graham & Dunn, Norton filed lawsuits against U.S. Bank and Prater and pursued recovery in Peru that resulted in obtaining $6 million in arbitration.

In addition, as the trial court correctly notes, Norton provided "no explanation for why, through reasonable investigation, [he was] unable to access the November 2008 email on which [he relies]."

The case Norton relies on, Price v. State, 96 Wn. App. 604, 980 P.2d 302 (1999), is distinguishable. In Price, parents sued the Department of Social and Health Services (DSHS) for failing to disclose critical information about their adopted child. Price, 96 Wn. App. at 610-11. After repeated inquiries, DSHS provided the complete file to the parents 14 years after the adoption. Price, 96 Wn. App. at 607-10. The file revealed information that would have affected the parents' decision to adopt. Price, 96 Wn. App. at 610-11. DSHS moved for summary judgment arguing the parents knew or should have known DSHS failed to provide all of the child's records and the parents' continued inquiries showed they suspected DSHS of wrongdoing. Price, 96 Wn. App. at 611-12. The court dismissed the lawsuit against DSHS as barred by the statute of limitations. Price, 96 Wn. App. at 612. We reversed. Price, 96 Wn. App. at 619. We concluded the complete file provided critical evidence of proximate cause. Price, 96 Wn. App. at 616-17. Here, unlike in Price and contrary to Norton's assertion, the November 14, 2008 e-mail is not the critical piece of evidence necessary to assert claims against Graham & Dunn for violation of the WSSA and aiding and abetting fraud.

Denial of Motion for Reconsideration

As an alternative and separate ground for reversal, Norton argues equitable tolling warrants tolling of the statute of limitations and the court erred in denying his motion for reconsideration.

"Motions for reconsideration are addressed to the sound discretion of the trial court and a reviewing court will not reverse a trial court's ruling absent a showing of manifest abuse of discretion." Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005). "A trial court abuses discretion when its decision is based on untenable grounds or reasons." Wilcox, 130 Wn. App. at 241.

Washington courts "allow[ ] equitable tolling when justice requires." Millay v. Cam, 135 Wn.2d 193, 206, 955 P.2d 791 (1998). "[E]quitable tolling is appropriate when consistent with both the purpose of the statute providing the cause of action and the purpose of the statute of limitations." Millay, 135 Wn.2d at 206. A court may apply equitable tolling when there is "bad faith, deception, or false assurances by the defendant and the exercise of diligence by the plaintiff." Millay, 135 Wn.2d at 206.

Because Norton did not exercise due diligence, the court did not abuse its discretion in denying Norton's motion for reconsideration. See Douchette v. Bethel Sch. Dist. No. 403, 117 Wn.2d 805, 812-13, 818 P.2d 1362 (1991) (declining to equitably toll a statute of limitations where the plaintiff "had ample opportunity and time to pursue" claims).

We affirm summary judgment dismissal of the lawsuit against Graham & Dunn as barred by the statute of limitations.

WE CONCUR: